# Investigation of Nevada's Use of Institutions to Serve Children with Behavioral Health Disabilities



United States Department of Justice
Civil Rights Division

October 4, 2022

## <u>TABLE OF CONTENTS</u>

I.    **SUMMARY OF FINDINGS** ........................................................................ 1

II.   **INVESTIGATION** ..................................................................................... 2

III.  **LEGAL FRAMEWORK** ........................................................................... 3

IV.  **NEVADA'S PUBLIC BEHAVIORAL HEALTH SYSTEM FOR CHILDREN** .......... 6

V.   **NEVADA CHILDREN WHO ARE APPROPRIATE FOR COMMUNITY-BASED SERVICES ARE PLACED IN OR AT SERIOUS RISK OF PLACEMENT IN SEGREGATED SETTINGS** .................................................................... 7

    A.  Nevada's Hospitals are a Primary Source of Behavioral Health Services for Children and a Gateway to Long-Term Residential Placements.................... 7

    B.  Nevada Relies on Residential Treatment Facilities Both in and out of the State to Treat Children with Behavioral Health Disabilities ........................................ 9

        1.  Children Spend Long Periods in Residential Treatment Facilities...................... 10

        2.  Residential Treatment Facilities are Highly Restrictive and Segregated............. 10

    C.  Children in or at Serious Risk of Entering Segregated Settings are Appropriate for the Community .............................................................................. 11

    D.  Children and Their Families Do Not Oppose Community-Based Services .................. 11

VI.  **NEVADA'S POLICIES AND PRACTICES RESULT IN UNNECESSARY SEGREGATION OF CHILDREN** ............................................................ 12

    A.  Children Enter Segregated Settings Because Nevada Does Not Ensure Access to Necessary Community-Based Services ................................................ 12

        1.  Nevada Does Not Make Available Intensive In-Home Supports and Services Needed to Avoid Institutionalization ...................................................... 14

        2.  Nevada Does Not Make Available Crisis Services Needed to Avoid Institutionalization .......................................................................... 16

        3.  Intensive Care Coordination is Not Available to Children Who Need It to Avoid Institutionalization ................................................................ 19

        4.  Nevada Does Not Make Available Respite, Therapeutic Foster Care, and Other Family-Based Supports Needed to Avoid Institutionalization .................. 20

    B.  Nevada Fails to Provide Effective Oversight and Management of its Children's Behavioral Health System to Prevent Unnecessary Segregation ................... 20

        1.  The State has Failed to Establish and Maintain a Sufficient Provider Network to Deliver Key Services ........................................................... 21

        2.  The State Fails to Connect Children with Community-Based Behavioral Health Services and Avoid Their Admission to Segregated Settings.................. 22

i

3.   The State Fails to Ensure Appropriate Discharge Planning to Prevent
      Unnecessarily Long Stays and Readmissions.......................................................... 22

**VII. IT IS A REASONABLE MODIFICATION TO SERVE CHILDREN WITH
BEHAVIORAL HEALTH DISABILITIES IN THE COMMUNITY ......................... 23**

**VIII.   CONCLUSION .............................................................................................................. 25**

After an extensive investigation, the United States Department of Justice (DOJ) concludes there is reasonable cause to believe that the State of Nevada violates Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, by failing to provide services to children with behavioral health disabilities[1] in the most integrated settings appropriate to their needs.

## I.    SUMMARY OF FINDINGS

Nevada does not provide its children with behavioral health disabilities with adequate community-based services.  Instead, Nevada relies on segregated, institutional settings, like hospitals and residential treatment facilities, to serve children with behavioral health disabilities.

Children experience frequent and lengthy stays in these institutional settings.  Over 1,700 of Nevada's children were admitted to a hospital for psychiatric care in fiscal year 2020.  That same year, over 480 children received services in residential treatment facilities.  Once in residential placements, children stay for a long time.  The State reported that children remain in residential placements for an average of nine to twelve months.  Many stay even longer—27% of the children admitted to residential treatment facilities between August and October of 2019 stayed for over a year.

This is so even though the State acknowledges that many placements in institutional settings can be avoided if children receive necessary, community-based services.  And the State's service system was designed to provide community-based services, including therapy, behavior supports, crisis services, and care coordination.  Nonetheless, the State does not:

- ensure that key community-based behavioral health services are available;

- maintain an adequate provider network for those services;

- connect children with services that could prevent institutional placements; or

- connect children who enter an institutional setting with community-based services so they can return to the community and remain there successfully.

Children who have a demonstrated need for community-based services to avoid institutionalization often cannot access that care.  For example, the State has a children's mobile crisis response program, but capacity issues have substantially increased the response time to crisis calls, leaving many children and families to seek care from hospitals.  Data also revealed that most children in a sample of recent residential placements did not get the State's behavioral support services before or after placement.  And the number of children who received intensive care coordination through Wraparound in Nevada in fiscal year 2020 was less than a fifth of the

---

[1] Children with behavioral health disabilities are individuals up to the age of 21 who have a diagnosable serious emotional disturbance, mental illness, and/or substance use disorder. This population includes children with co-occurring intellectual or developmental disabilities.

number of children who were hospitalized for psychiatric care that year.  Lack of access to these services results in unnecessary reliance on segregated placements.

State government leadership is well aware of these challenges.  Regional Consortia charged with developing recommendations for children's mental health services have repeatedly highlighted the lack of access to critical community-based services.  The national organization Mental Health America has also highlighted the deficiencies in Nevada's system in its Ranking the States report.  For the last five years, Nevada ranked last in the nation in children's mental health based on prevalence of illness and access to care among children.

Nevada's deficiencies are exemplified by the experiences of Martin,[2] a child who was appropriate for community-based services but instead received treatment at two residential treatment facilities.  Martin had experienced abuse and family disruption as a young child and had difficulty maintaining relationships with others and controlling his anger.  Not long after a psychiatric hospitalization, at eight years old, Martin was placed in a residential treatment facility.  Records indicate that he had received few community-based services prior to this admission.  After eight months at one residential treatment facility in Nevada, he was sent to another residential treatment facility in Colorado, nearly 1000 miles away from his home in Reno.  At his admission to that facility, he reported that his only wish was "to not be here."  By the time he was discharged seven months later, he had spent nearly 15 months of his childhood away from family and friends.

The State can reasonably modify its service system to ensure children are served in the most integrated settings appropriate to their needs.  Nevada has included key building blocks of an effective community-based service system in its Medicaid State Plan.  The State could reasonably modify its system by expanding the availability of these services, supporting and managing its provider network to increase quality and access, assessing children and diverting them to community-based services before they enter institutions, and, for children already in institutions, engaging them in discharge planning to quickly and successfully return home.

## II.    INVESTIGATION

On December 17, 2020, after receiving a complaint, DOJ opened an investigation to determine whether Nevada unnecessarily institutionalizes children with behavioral health disabilities.  After opening the investigation, DOJ attorneys and expert consultants conducted an extensive review of documents, including individual treatment records of a sample of children who had recently lived in residential treatment facilities.  Our team conducted dozens of interviews of State officials and staff.  We also spoke with community-based providers, county officials, advocates, family members of Nevada children with behavioral health disabilities, and children who had received services in institutional settings.  Additionally, we conducted remote and on-site visits to 12 facilities, including psychiatric hospitals, residential treatment facilities, juvenile justice facilities, and a child welfare shelter.

---

[2] All names in this Report have been changed.

We thank the State and State officials we interviewed for the exceptional assistance, cooperation, and candor extended to us throughout our investigation.  We also thank all of the community members, families, and children who provided valuable information.

### III.    LEGAL FRAMEWORK

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[3]  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."[4]  Accordingly, the "ADA is intended to insure that qualified individuals receive services in a manner consistent with basic human dignity rather than a manner which shunts them aside, hides, and ignores them."[5]

Under Title II of the ADA, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."[6]  The most integrated setting appropriate is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."[7]  The regulations also require public entities to make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that such modifications would fundamentally alter the nature of the service, program, or activity.[8]

In *Olmstead v. L.C.*, the Supreme Court applied these authorities and held that public entities are required to provide community-based services to people with disabilities when (a) such services are appropriate; (b) the affected people do not oppose community-based services; and (c) community-based services can be reasonably accommodated, taking into account the resources available to the entity and the needs of other people with disabilities.[9]  The Court explained that unnecessary institutionalization "perpetuates unwarranted assumptions that

---

[3] 42 U.S.C. § 12101(b)(1).

[4] 42 U.S.C. § 12101(a)(2).

[5] *Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995).

[6] 28 C.F.R. § 35.130(d); *see also* 42 U.S.C. § 12101(b).

[7] 28 C.F.R. Part 35, App. B.

[8] 28 C.F.R. § 35.130(b)(7).

[9] *See* 527 U.S. 581, 607 (1999).

persons so isolated are incapable or unworthy of participating in community life."[10]  The Court also recognized the harm caused by unnecessary institutionalization when it found that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."[11]  The ADA's integration mandate applies both to people who are currently institutionalized and to people who are at serious risk of unnecessary institutionalization.[12]

If a state fails to reasonably modify its service system to provide care in the most integrated setting appropriate, it violates Title II of the ADA.[13]  Courts have found proposed modifications that expand existing services to be reasonable, particularly when the modifications align with the jurisdiction's own stated plans and obligations.[14]

The State has a separate legal obligation to ensure the availability of community-based services provided under its Medicaid State Plan.  The State must ensure that State Plan services are available with reasonable promptness statewide to everyone who meets Nevada's Medicaid eligibility criteria.[15]  Additionally, the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions of the Medicaid Act require that state Medicaid programs provide children

---

[10] *Id.* at 600.

[11] *Id.* at 601.

[12] *See Steimel v. Wernert*, 823 F.3d 902, 911-12 (7th Cir. 2016); *Davis v. Shah*, 821 F.3d 231, 262-64 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321-22 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1115-18 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180-82 (10th Cir. 2003); *United States v. Mississippi*, 400 F. Supp. 3d 546, 553-54 (S.D. Miss. 2019); *Hiltibran v. Levy*, 793 F. Supp. 2d 1108, 1115-16 (W.D. Mo. 2011).  A state's failure to provide community services may create a risk of institutionalization.  *Pashby*, 709 F.3d at 322; *Fisher*, 335 F.3d at 1182 ("[F]ailure to provide Medicaid services in a community-based setting may constitute a form of discrimination.").  *See also Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir. 2004) ("[A] State may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting.").

[13] *See Olmstead*, 527 U.S. at 607; 28 C.F.R. § 35.130(b)(7).

[14] *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280-81 (2d Cir. 2003) (upholding as a reasonable modification an order requiring agency to follow existing law and procedures); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1030 (D. Minn. 2016) (providing Medicaid waiver services to eligible people, particularly from existing waiver funds, is a reasonable modification); *Hiltibran*, 793 F. Supp. 2d at 1116 (explaining that a state providing a specific Medicaid service for people in institutions must provide it for Medicaid enrollees who need it in the community); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1304-05 (M.D. Fla. 2010) (providing a service already in state's service system to additional people is not inherently a fundamental alteration); *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 344-45 (D. Conn. 2008) (finding that plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans, was reasonable).

[15] *See* 42 U.S.C. § 1396a(a)(8) (with reasonable promptness); 42 U.S.C. § 1396a(a)(1) (statewide). *See also* 42 C.F.R. § 435.930; 42 C.F.R. § 431.50.

under the age of 21 with any services coverable under the Medicaid Act necessary to correct or ameliorate a mental illness or condition, regardless of whether that service is included in their State Plans.[16]  The EPSDT obligation is broad, requiring Nevada as a Medicaid participant to provide comprehensive health care services, including community-based services.[17]

Offering community-based services, in compliance with *Olmstead*, also improves the lives of children with behavioral health disabilities.  Children served in the community frequently show a decrease in clinical symptoms, an increase in behavioral and emotional strengths, improved school outcomes, reduced suicide attempts, and decreased contacts with law enforcement.[18]

In contrast, children face significant harms from residential care.  Residential treatment for children is associated with higher rates of physical and sexual abuse, impaired social and interpersonal development, delayed cognitive, intellectual and language development, higher rates of developmental deficits, emotional attachment disorders, and even poor health and stunted physical growth.  Nationally, "[t]he rate of self-reported physical abuse in residential care was almost double that of foster care and triple that of the general population of same age adolescents."[19]

Community-based care is also markedly less costly than residential treatment: national data demonstrate that community-based services cost just 25% of what residential treatment would cost, yielding an average annual savings of $40,000 per child served in the community.[20]

---

[16] *See* 42 U.S.C. § 1396d(r)(5).

[17] *See Rosie D. v. Romney*, 410 F. Supp. 2d 18, 52-53 (D. Mass. 2006) ("[T]he EPSDT provisions of the Medicaid statute require, by their very language, comprehensive assessments of children with SED [serious emotional disturbance]. . . . [T]he EPSDT provisions of the Medicaid statute require provision of adequate in-home behavioral support services for SED children."). *See also Katie A. v. Los Angeles County*, 481 F.3d 1150, 1159-60 (9th Cir. 2007) (agreeing that states have an obligation under the EPSDT mandate to provide effective in-home behavioral support services to children with mental illness, but overturning the lower court's requirement that the services be bundled); Centers for Medicaid and Medicare Services & Substance Abuse and Mental Health Services Administration, *Joint CMS and SAMHSA Informational Bulletin: Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions* (Joint CMS and SAMHSA Informational Bulletin) (May 7, 2013), https://perma.cc/R9QG-RMBA.

[18] Joint CMS and SAMHSA Information Bulletin 2, https://perma.cc/R9QG-RMBA.

[19] Mary Dozier et al., *Consensus Statement on Group Care for Children and Adolescents: A Statement of Policy of the American Orthopsychiatric Association*, 84 Am. J. of Orthopsychiatry 222 (2014), https://perma.cc/QG37-NPUP.

[20] Joint CMS and SAMHSA Information Bulletin 2, https://perma.cc/R9QG-RMBA.

Serving children in the most integrated setting appropriate is required by the ADA, less costly than institutional care, and associated with significant improvements in quality of life for children and their families.

## IV.    NEVADA'S PUBLIC BEHAVIORAL HEALTH SYSTEM FOR CHILDREN

Nevada provides behavioral health services through its Department of Health and Human Services (DHHS).  Responsibilities relating to children's behavioral health are divided among several of the Divisions within the Department.

The Division of Health Care Finance and Policy (DHCFP) administers health insurance to eligible children and families through Nevada Medicaid.[21]  Nevada's Medicaid program covers community-based behavioral health services, inpatient acute hospitalization services, and residential treatment facility[22] services for children.  Among the community-based services included in Nevada's Medicaid program are crisis intervention, therapy, partial hospitalization and intensive outpatient programs, medication management, and case management services.  The Medicaid program also includes Psychosocial Rehabilitation (PSR) and Basic Skills Training (BST), two behavioral support services designed to improve functioning and teach life skills.[23]

Most Medicaid-funded services are offered through private providers, but State agencies are also direct providers of some behavioral health services.  For example, the Division of Child and Family Services (DCFS) runs Desert Willow Treatment Center, which has an acute inpatient hospital and a residential treatment facility, and three Psychiatric Residential Treatment Facilities.[24]  DCFS also directly operates an intensive care coordination program, called Wraparound in Nevada (WIN), and the Mobile Crisis Response Team (MCRT).  In addition, DCFS runs outpatient children's mental health clinics in both Reno and Las Vegas.  Similarly,

---

[21] The scope of coverage and accompanying procedures for Nevada Medicaid are laid out in the Medicaid Services Manual.  Nevada Division of Health Care Financing and Policy, Medicaid Services Manual, https://perma.cc/U4EE-Q9TA.

[22] The federal Medicaid agency uses the term Psychiatric Residential Treatment Facility (PRTF) to describe an inpatient non-hospital setting for children; requirements for such facilities are outlined at 42 C.F.R. Subpart D. Many, but not all, of the residential treatment facilities that serve children with behavioral health needs are PRTFs. In Nevada's Medicaid Services Manual, these services are called Residential Treatment Center (RTC) services. Moreover, the federal Family First Prevention Services Act uses, and Nevada has adopted, the term Qualified Residential Treatment Program (QRTP) to describe certain residential treatment facilities whose services may be financed by federal child welfare funds.  See 42 U.S.C. § 672 (k)(4).  To avoid confusion and include the full range of facilities in which Nevada children are placed, we use the generic term "residential treatment facility" in this Report.

[23] Nevada Division of Health Care Financing and Policy, Medicaid Services Manual, Sections 403.6C & 403.6G (March 30, 2022), https://perma.cc/9EUD-XWCV.

[24] In 2021, DCFS announced plans to close one of its PRTFs and transfer some of the population and services to Desert Willow Treatment Center.  See Nevada Department of Health and Human Services, *Division of Child and Family Services Expands Residential Services* (Aug. 20, 2021), https://perma.cc/F45W-KJUB.

the Division of Public and Behavioral Health (DPBH) operates mental health clinics for both adults and children in 12 rural counties across Nevada.  The Aging and Disability Services Division (ADSD) provides services to children with intellectual and developmental disabilities.

The State government also convenes and participates in three Children's Mental Health Consortia that make recommendations regarding services for children with behavioral health disabilities.  Each consortium represents one of three geographic divisions of the State: Clark County Children's Mental Health Consortium (Las Vegas area), Washoe County Children's Mental Health Consortium (Reno area), and Rural Nevada Children's Mental Health Consortium (the remaining counties).  These Consortia are composed of stakeholders, including agency personnel, families, and providers.

## V. NEVADA CHILDREN WHO ARE APPROPRIATE FOR COMMUNITY-BASED SERVICES ARE PLACED IN OR AT SERIOUS RISK OF PLACEMENT IN SEGREGATED SETTINGS

Most children with behavioral health disabilities can remain in their homes and communities if they receive adequate community-based services.  But in Nevada, segregated settings are frequently seen as the only option for children with behavioral health disabilities.  Because Nevada fails to ensure access to community-based services that could prevent institutionalization, children experience avoidable, and often repeated, hospitalizations.  Children who experience this cycle of repeated hospitalizations are frequently sent to long-term placements in residential treatment facilities.  Many of these residential treatment facilities are outside Nevada, exacerbating the harms of the segregation.

### A. Nevada's Hospitals are a Primary Source of Behavioral Health Services for Children and a Gateway to Long-Term Residential Placements

Because the State has failed to ensure access to community-based services, including crisis supports, children and families frequently turn to hospitals as a first stop for treatment.  Children often begin their path toward institutionalization at hospital emergency departments.  The Clark County Children's Mental Health Consortium recently described the dynamic: "Without easy access to crisis intervention and stabilization services, families . . . have been forced to utilize local emergency rooms in order to obtain behavioral health care for their children."[25]

The State reported that in 2020, 4,280 children were treated in emergency departments for behavioral health conditions.  There is reason to believe that this number is increasing.  For example, a hospital in Las Vegas recently informed DCFS that admissions to its pediatric

---

[25] Clark County Children's Mental Health Consortium, *2022 Service Priorities Report* 5, https://perma.cc/V5MJ-5RJ3.

emergency room for behavioral health emergencies increased by 65% between 2019 and 2021.[26] The State published a white paper acknowledging that "hospital emergency departments are the primary means by which people in Nevada gain access to necessary behavioral health services."[27] In 2021, a group of advocates reached out to State leadership about this issue, noting that inadequate services have led to vulnerable children experiencing extended stays in local emergency rooms, among other consequences. For example, we learned of a six-year-old who spent ten days in an emergency room in a hospital in Reno seeking behavioral health services. Billing data for a group of children who went to residential treatment facilities underscore the role of emergency departments as a gateway to longer institutional stays: more than 60% of the children in our sample had at least one emergency department claim related to their behavioral health disabilities.

The State's failure to provide crisis and ongoing community-based services to children also results in admissions to psychiatric hospitals. The State has reported a rising rate of child inpatient hospital admissions, with an increase from 1,460 acute psychiatric admissions in 2017 to 1,721 admissions in 2020. Many of these children cycle in and out of hospital settings. One parent told us about her 14-year-old son Bryan, whom she adopted when he was four. Bryan needs behavioral health services, and he has not been able to get those supports in the community. Since moving to Nevada several years ago, he has been admitted to four different hospitals but has not gotten the community-based services he needs to avoid more admissions. This parent told us that if she knew about the State's lack of behavioral health services, she never would have moved Bryan to Nevada. We spoke to another parent whose 15-year-old had experienced over 14 psychiatric hospitalizations; yet another parent told us that her 17-year-old son had been admitted and discharged from the same hospital eight times. Repeated admissions were a recurring theme in our conversations with parents, children, and professionals.

Children who are hospitalized are frequently discharged without needed community-based services, which then can lead to more hospitalizations. Multiple hospitalizations then frequently lead to placement in residential treatment facilities. One provider summarized the dynamic: "At about the third or fourth hospitalization they say you have to go to residential." Because children cannot access community-based services to prevent hospital admissions and re-admissions, hundreds cycle through hospitals and are ultimately referred to residential treatment facilities.

---

[26] We recognize that the COVID-19 pandemic and other recent stressors have impacted children's behavioral health throughout the country, reflected in increases in emergency department visits. *See* The U.S. Surgeon General's Advisory, *Protecting Youth Mental Health* (Dec. 2021), https://perma.cc/Y734-4E8W; Agencies within the U.S. Department of Health and Human Services, Joint Letter (May 25, 2022), https://perma.cc/3FGF-EHE7.

[27] Nevada Division of Public and Behavioral Health, *Towards a Comprehensive Crisis Response System in Nevada* 2 (2020), https://perma.cc/9WDA-42AQ.

**B.  Nevada Relies on Residential Treatment Facilities Both in and out of the State to Treat Children with Behavioral Health Disabilities**

Each year, Nevada sends hundreds of children with behavioral health disabilities to residential treatment facilities in Nevada and throughout the country.  Until March 2021, the State published data on children in residential treatment facilities receiving services through Medicaid.[28]  The State reported 305 children in residential treatment in March 2021, with 130 of those children (43%) in residential facilities outside of Nevada.  Between July 2019 and February 2021, Nevada financed 779 residential treatment stays for 667 children; 37% of these residential treatment stays were in out-of-state facilities.  The use of residential treatment, including out-of-state treatment, has been persistent.  The number of children in residential treatment facilities has not decreased significantly since at least 2016.[29]

Some children experience many residential treatment facility placements.  For example, Cara was 11 when she entered her first residential treatment facility after multiple psychiatric hospitalizations.  Despite being appropriate for community-based services, she has had a string of residential placements.  Cara reported that she was on her tenth facility placement when we met her at a state-run residential treatment facility at age 14;  when asked about when she would be discharged, she said simply "we've been working on this forever."

Children in settings far from home experience additional harms over and above those associated with segregated placements generally.  Nonetheless, the State has financed residential treatment for Nevada children as far away as Missouri, Georgia, Michigan, and South Carolina.

---

[28] Nevada Division of Health Care Financing and Policy, *BHS – Out of State Residential Treatment Center Reports*, https://perma.cc/BY5N-FSHJ.  These reports, published online by Nevada DHCFP until March 2021, show the total number of children in both in-state and out-of-state residential treatment facilities.  But the State has since stopped publishing these reports, and cumulative information about the total number of children in residential treatment facilities is no longer publicly available.  Nevada DCFS has launched an online dashboard showing only information about children in the foster care and juvenile justice systems who have been placed at out-of-state residential treatment facilities.  *See* Nevada Division of Child and Family Services, DCFS Data, https://perma.cc/C39Z-NSKT (accessed by navigating to "Children & Youth at Out-of-State RTC Facilities" link available under "Dashboards").  Because this dashboard shows only a portion of the children Nevada sends to residential treatment facilities, we do not rely on it.

[29] National demographic data reveal that children of color and LGBTQ+ children are overrepresented in residential treatment facilities.  *See, e.g.*, Sarah Fathallah and Sarah Sullivan, *Away From Home: Youth Experience of Institutional Placements in Foster Care* (July 2021), https://perma.cc/4MVZ-VZFE.  A recent study of youth experiences in congregate care settings found that children of color and LGBTQ+ youth in these settings frequently experienced discrimination while there.  *Id.* at 43.  In Nevada, Black children accounted for at least 20% of the population in residential treatment facilities in 2020, but only 11% of Nevada's child population is Black.  Stakeholders shared observations of a growing proportion of LGBTQ+ youth in need of behavioral health services and/or entering residential treatment facilities.  Consistent with these observations, we interviewed multiple children currently or formerly in residential treatment facilities who reported discrimination, bullying, or lack of acceptance on the basis of sexual orientation and/or gender identity in these settings.

One child placed over 400 miles from his home told us: "I don't think no kid should have to go into a treatment place and their parents aren't able to come visit them."

      1.   <u>Children Spend Long Periods in Residential Treatment Facilities</u>

The average length of stay for children in residential treatment facilities ranges from nine months to a year, according to a State official at the Division of Health Care Finance and Policy and the operators of multiple residential facilities. Some children stay even longer. Our analysis of data provided by the State revealed that at least 27% of children who entered residential treatment facilities between August and October 2019 stayed for more than a year. We interviewed multiple children who had been in facilities for two years or more. One nine-year-old who had recently arrived at a residential facility told us his biggest concern was that, "it's a long-term facility and I don't really like being away from home for that long." Many of the children and parents we interviewed provided long facility histories, noting that the children had bounced between multiple facilities—cumulatively spending years away from home. Some children were on their second, or even third, stay in a given facility. These children do not have the benefit of interacting with their non-disabled peers, being in their family homes, and engaging in typical childhood activities to learn about themselves and the world as they develop.

      2.   <u>Residential Treatment Facilities are Highly Restrictive and Segregated</u>

Children in residential treatment facilities have minimal access to their families, communities, and non-disabled peers. Most are enrolled in educational programs at the facilities, some of which include only online instruction. While in treatment settings, children experience a highly regimented, controlled daily schedule with limited free time or individual activities. Engagement in the broader community is very restricted. "We sometimes go on outings but then we have to come right back because we're stuck here," said one youth at a state-run facility.

The daily lives of children in many residential facilities are regulated by "level systems" in which children gain points or credit for good behavior and lose points for bad behavior. A child's level may control the child's activities, access to recreation, ability to leave the facility, or even contact with the child's family. Point and level systems have been criticized for their minimizing of individual autonomy and disconnection from the real world, among other issues.[30] These highly regimented and restrictive approaches may punish children for age- and developmentally-appropriate activities. For example, one child's residential treatment facility records contained incident reports and crisis team referrals for conduct such as "swinging his arms and acting goofy" and failing to stand in line. At another facility there is a "loss" level for children who have misbehaved; children stated that while on "loss," they cannot speak to any other children in the facility.

These levels may influence whether and when to discharge a child. At a private facility in rural Nevada, the program explicitly requires children to attain the highest level (by

---

[30] Association of Children's Residential Centers, *Redefining Residential: Trauma Informed Practice: Moving Away from Point and Level Systems* (Apr. 2019), https://perma.cc/9LAQ-PRWZ.

completing a certain number of weeks without bad behaviors or rule violations) before being considered for graduation.  A parent of a child at the facility reported that every time his child fails to eat all her food at a meal, she receives a "remediation" and must spend an extra week working up to the next level, thus delaying her graduation.  He summarized: "that's not psychiatric help, that's like being in prison."

### C.    Children in or at Serious Risk of Entering Segregated Settings are Appropriate for the Community

Our review of records of a sample of children receiving residential treatment revealed that a vast majority of those children were appropriate for community-based services.  Nonetheless, treatment histories, assessments, and other clinical documents revealed that most of the children in our sample did not receive necessary intensive community-based services prior to entering residential treatment facilities.

These children were appropriate for community-based services such as intensive in-home services, care coordination, crisis services, and therapeutic foster care or respite.  *See* below, Section VI.  Some appeared to have a need for short-term stabilization but were instead sent to long-term residential treatment.  Rather than receiving services that can be offered in the community while at home, like individual therapy and behavior support, these children received the same services in a segregated residential treatment facility.  Because they were subject to the programs and level systems discussed above, they also tended to remain in these placements for a long time.  The vast majority could instead have received community-based services as an alternative to their placement in residential treatment facilities.

### D.    Children and Their Families Do Not Oppose Community-Based Services

Overwhelmingly, the dozens of children residing in residential treatment facilities and hospitals with whom we spoke—and their parents or guardians—do not oppose receiving community-based services.  One mother described how her 12-year-old son ran away from a residential treatment facility, came home, and told her he just wanted to be with her.  Another mother told us 85% of her phone calls with her 10-year-old son who is institutionalized consist of his crying because he wants to come home.  Consistent with what we heard from parents and children, one therapist at an out-of-state residential facility stated that "every kid here wants to go home."

None of the parents or caregivers we spoke to opposed community-based services.  Instead, they reported that institutionalization was their only choice given the available services and supports.  When describing their goals for their child with behavioral health disabilities, parents and caregivers overwhelmingly expressed a desire for their child to live at home with the appropriate services.  Parents whose children were institutionalized expressed how difficult it is not to see their children for extended periods of time and described feeling that they were too far away.  These thoughts were reflected by an admissions coordinator at an out-of-state facility, who told us: "I never met a parent who was excited to send their kid out-of-state."

11

A parent whose 14-year-old daughter has been institutionalized 47 times—including at residential treatment facilities in and out-of-state, hospitals, and juvenile detention centers—told us that every day away from her daughter hurts.  Several parents expressed concern that being away from home at a residential treatment facility is making things worse and even harming their children.  One parent worried that her adopted son feels abandoned: "[W]e were supposed to be a forever family."  Parents shared that they wished there were community-based services available so they could avoid sending their children away.  One parent summarized the overall sentiment we heard from parents: She is tired of her son not being home and tired of him not getting what he needs.

## VI.    NEVADA'S POLICIES AND PRACTICES RESULT IN UNNECESSARY SEGREGATION OF CHILDREN

### A.  Children Enter Segregated Settings Because Nevada Does Not Ensure Access to Necessary Community-Based Services

Children in Nevada are unnecessarily hospitalized and placed in residential treatment facilities due to a lack of community-based services.  Throughout our interviews with state officials, county officials, providers, families, and advocates, we heard a consistent theme: Nevada has insufficient community-based behavioral health services for children and adolescents.  This is acknowledged by the top officials of DHHS.  Stakeholders told us that the system "is in crisis."  While the State has adopted many of the services that are known to prevent unnecessary institutional placements in its system and built them into its Medicaid State Plan, they are not consistently available to children at serious risk of entering residential treatment facilities.  Intensive in-home services, crisis services, care coordination, respite care, therapeutic foster care, and peer supports are not available in sufficient quantity or effectiveness to prevent children from entering residential treatment facilities.

Nevada has known about the inadequacies of its behavioral health system for children for years.  A 2016 State-commissioned Children's Mental Health Needs Assessment noted:

In Nevada, children with mental health issues are much less likely to receive treatment than children in comparable states . . . .  Currently, Nevada is the lowest ranked state (51) for youth with mental illness. . . . [T]he rate at which Nevada lags behind [compared to similar cities and states] is staggering.  On average, only about 29% of kids in Nevada will receive the mental health services they need.[31]

For the last five years, the nonprofit Mental Health America has ranked Nevada 51st in the nation (out of 50 states and the District of Columbia) in children's mental health care.[32]  This

---

[31] Kelly Stout & Alexis Kennedy, Strategic Progress LLC, *Nevada Children's Mental Health Needs Assessment* 7 (Oct. 3, 2016), https://perma.cc/M9L9-F93T (citations omitted).

[32] *See* Mental Health America, *Ranking the States 2022*, https://perma.cc/ZG6V-M9B7 (linking to reports indicating that Nevada ranked 51st in the Youth Ranking in 2022, 2021, and 2020); Mental Health America, *State of Mental*

ranking is based on Nevada's prevalence of mental illness among children and lower rates of access to care.  Nevada has acknowledged that "[f]or people experiencing a mental health crisis in Nevada, mental health care systems and services are inadequate."[33]  While significant challenges in access to community-based services exist in all parts of the State, the State has recognized that services are particularly inaccessible in the State's rural regions.

This insufficient community-based care for children in Nevada causes unnecessary stays in hospitals and residential treatment centers.  Officials throughout DHHS told us that Nevada lacks community-based services that would prevent hospitalization and residential placement.  One high-ranking official acknowledged that the hospitalization rates in Nevada are a result of the state's lack of access to community-based services.  Another official told us that due to a lack of services, there is a mindset in Nevada that "children need to go to residential."  Officials also acknowledge that insufficient community-based services mean that children stay longer in institutional placements because there are not adequate services for them upon discharge.

The lack of community-based services has led to the placement of many children with behavioral health disabilities in institutional settings through the child welfare and juvenile justice systems.  Within a random sample of treatment records of Nevada children who recently experienced residential treatment, we found that over 75% included evidence of current or past involvement in the child welfare and/or juvenile justice systems.  One child we spoke with, Shannon, had been in foster care, two hospitals, two residential treatment facilities, and a juvenile correctional facility.  We heard numerous similar stories of youth who bounced between hospitals, shelters, juvenile justice settings, and residential treatment.

In some cases, children with behavioral health disabilities enter the child welfare or juvenile justice system based on the belief that children receive more services through these public systems.  Parents have told us that primary care physicians and police officers recommended they relinquish custody to get their children the care they need.[34]  Child welfare staff report that parents leaving their children, particularly those with behavioral health disabilities, at Clark County's emergency shelter—Child Haven—is near an all-time high.[35]  And

---

*Health America Past Reports*, https://perma.cc/X3V3-NJXL (linking to reports indicating that Nevada ranked 51st in the Youth Ranking in 2019 and 2018).

[33] Nevada Division of Public and Behavioral Health, Towards a Comprehensive Crisis Response System in Nevada 2 (2020), https://perma.cc/9WDA-42AQ.

[34] In recognition of this problem, in 2019 the Nevada Legislature passed Assembly Bill 387, which creates a new State task force to prevent the relinquishment of custody or voluntary placement of children in foster care "solely to allow the children to receive services to address a mental illness or emotional disturbance."  Nev. Rev. Stat. § 433B.3393.  But this program was still being developed in 2021, and its impact is not yet clear.

[35] April Corbin Girnus, *Lack of Mental Health Resources Increases Demand on NV's Child Welfare System, Say Administrators*, Nevada Current (Apr. 25, 2022), https://perma.cc/UX3H-5PNW.

some parents reported being advised to call the police to seek the arrest of their children for behavioral health-related conduct.

For children with juvenile justice involvement, the lack of community-based behavioral health services places them at increased risk of elongated justice system involvement and placement in restrictive facilities such as juvenile detention centers and juvenile correctional facilities. According to the State's Juvenile Justice Program Manager, the State is "housing kids in our State facilities with severe mental health issues" because they have no other solutions. A particular target for such placements is Caliente Youth Center (CYC), a lower-security juvenile correctional facility and the State's only juvenile facility that houses girls. The Superintendent of CYC described an influx of children with "high needs but low risk" ending up in this correctional setting due to inadequate resources and supports for this population. Eighty percent of the children at CYC when we visited had a behavioral health diagnosis. Three-quarters of the girls and over one-third of the boys at CYC had a history of suicidal ideation or previous behavioral health placements, or both. Both administrative and treatment professionals with experience working at CYC told us that children with behavioral health disabilities stay longer at CYC than others due to a lack of available options for them upon discharge. Institutional and restrictive placements can exacerbate the children's behavioral health disabilities, place them at increased risk of further institutional placements in residential treatment facilities and psychiatric hospitals, and separate them from their homes, families, and communities for long periods of their childhoods.

Advocates, community-based and residential providers, judges, and other community members agree that Nevada's lack of community-based services leads to unnecessary institutionalization. One advocate noted: "It is understood statewide that we are over-reliant on residential treatment centers because we lack community supports." One parent, whose 12-year-old has experienced at least 25 emergency room visits and at least four hospitalizations or residential placements, stated that if intensive services had been available "none of this would have happened." And clinical staff at an out-of-state residential treatment center we spoke with told us that Nevada children were particularly difficult to discharge because of inadequate services available to them.

    1.   <u>Nevada Does Not Make Available Intensive In-Home Supports and Services Needed to Avoid Institutionalization</u>

Many children enter residential treatment facilities or stay longer than necessary because they cannot access intensive in-home services. Intensive in-home services typically include individual and family therapy, skills training, and behavioral interventions delivered in children's homes and other community settings to prevent institutional placements.[36] Officials throughout DHHS acknowledge that, in practice, Nevada lacks intensive in-home services that could prevent hospitalization or residential treatment. A recent Administrator of DCFS identified these

---

[36] Joint CMS and SAMHSA Informational Bulletin 4, https://perma.cc/R9QG-RMBA.

services as a primary gap in Nevada's array. State officials, residential providers, and members of the judiciary agree that intensive in-home services could keep children in their communities. The Clark County Children's Mental Health Consortium has also recommended "a strong focus" on providing intensive in-home services to allow children and families to "stay together and do so in the least restrictive environment."[37] State officials told us that they believe children in Nevada need intervention in their behavioral health conditions earlier, before a crisis point is reached. Indeed, the Director of DHHS acknowledged that the State had not built the capacity to intervene early in order to avoid hospitalization or residential treatment. [38]

While the State has services in its Medicaid array that can, in theory, meet this need, many children with significant needs never receive them, and the quality and intensity of the services for those who do receive them is uncertain. For example, the service descriptions for psychosocial rehabilitation (PSR) and behavior skills training (BST) outline behavioral support services that could be used to prevent out-of-home placement for children struggling in the community. Despite the potential that these services could prevent residential placements, only 44% of a randomly selected sample of children who had recently been placed in residential treatment received PSR or BST before or after residential treatment. Additionally, stakeholders identified concerns both with the intensity of these services for those who received them and with their effectiveness in their current form. Providers and officials agreed that administrative barriers and low reimbursement rates from Nevada Medicaid dissuade providers from offering these in-home services.

Similarly, in-home therapy is not provided with the intensity or frequency needed to prevent institutional placement. Most providers of therapy to children are private office-based clinicians.[39] The system is geared toward time-limited, once-weekly, office-based therapy. And Nevada's Medicaid billing structure requires prior authorization for more than 26 visits per calendar year, which a State official acknowledged is insufficient to serve children with high needs. One mother told us about her child, who had experienced 14 or 15 hospitalizations and a residential stay. The child, who had significant ongoing needs, was referred for weekly therapy upon discharge. Providing limited access to traditional office-based therapy is likely to result in unnecessary segregation of children with significant needs.

---

[37] Clark County Children's Mental Health Consortium, *2022 Service Priorities Report* 8, https://perma.cc/V5MJ-5RJ3.

[38] Many of the existing services are oriented toward school-age children and teens. Stakeholders and state officials reported that there are few behavioral health services for very young children, though Nevada has acknowledged that early intervention can "prevent future entry points into the various systems such as juvenile justice and child welfare." Letter from Governor's Commission on Behavioral Health to Governor Sisolak 6 (July 12, 2019), https://perma.cc/AP7H-2RSH.

[39] The State also directly provides behavioral health services to children through clinics, though the reach of these clinics is limited.

15

Peer support also is not sufficiently available to children and families to prevent institutionalization. Youth peer support services are services provided by "youth with 'lived experience' who have personally faced the challenges of coping with serious mental health conditions," and family peer support services are provided by family members of youth with lived experience.[40] Our review of billing data showed that almost no children received peer support through Medicaid. Stakeholders have noted that changes need to be made to Nevada's Medicaid definitions to allow for adequate provision of youth and family peer support. All three Children's Mental Health Consortia have noted the need for expansion of peer support.[41]

Intensive in-home supports and services are particularly lacking for children dually diagnosed with behavioral health and intellectual and developmental disabilities.[42] State officials have acknowledged fragmentation and confusion over which entities should serve children in this population. Limited State efforts to serve the population with dual diagnoses do not extend statewide and do not provide a sufficient array of accessible services. Because children with intellectual and developmental disabilities, particularly those with aggressive behaviors, cannot receive the intensive and consistent services they need to avoid institutionalization, many enter residential treatment facilities. Eighteen percent of a random sample of children who had recent stays at residential treatment facilities had intellectual or developmental disabilities.

2.    <u>Nevada Does Not Make Available Crisis Services Needed to Avoid Institutionalization</u>

When properly designed and implemented, "mobile crisis response and stabilization services are instrumental in de-escalating difficult mental health situations and preventing unnecessary out-of-home placements, particularly hospitalizations."[43] Nevada has acknowledged the importance of crisis services as well as the ineffectiveness of its crisis response system for children. A State report notes that "crisis mental health care in Nevada is reactive and fragmented, creating a revolving door for people in crisis, increasing costs to the

---

[40] Joint CMS and SAMHSA Informational Bulletin 4, https://perma.cc/R9QG-RMBA.

[41] Clark County Children's Mental Health Consortium, *2022 Service Priorities Report* 6-7, https://perma.cc/V5MJ-5RJ3; Rural Children's Mental Health Consortium, *2021 Annual Report* 7, 9, 12, https://perma.cc/Y9EX-8KZP; Washoe County Children's Mental Health Consortium, *2020 Annual Report* 25, https://perma.cc/KWR9-2XCJ.

[42] The Clark County Children's Mental Health Consortium has also recognized that "youth with dual diagnosis continue to experience problems obtaining the proper treatment." Clark County Children's Mental Health Consortium, *2022 Service Priorities Report* 10, https://perma.cc/V5MJ-5RJ3.

[43] Joint CMCS and SAMHSA Informational Bulletin 5, https://perma.cc/R9QG-RMBA.

community, and potentially increasing risks for individuals experiencing crises. Systems currently deliver minimal care for some individuals while others . . . fall through the cracks."[44]

Medicaid covers crisis services in Nevada, and some crisis services are available. The primary method through which Nevada offers crisis services is through its state-run Mobile Crisis Response Team (MCRT).[45] While Nevada's crisis hotline operates 24/7, mobile crisis availability varies by region. For example, for children in the rural regions, mobile crisis is solely operated through telehealth, and a state official working in the rural regions told us that they are "just barely keeping it together" and have needs for improved hotline access and more staff.

Although mobile crisis services should be used to prevent visits to the hospital, in Nevada, MCRT is often not called until a child has arrived at the hospital. State data show that the largest percentage of calls to the state's mobile crisis line comes from hospital emergency departments. MCRT staff are often deployed to emergency departments to determine whether a child meets the criteria for psychiatric hospitalization.

As detailed by mobile crisis front-line workers and state officials responsible for implementing the program, statewide, MCRT suffers from inadequate staffing, limiting its utility. The State reported to a legislative committee that "[f]ull implementation [of crisis response] would result in doubling or tripling the number of child mobile crisis responses." State officials reported that capacity issues have substantially increased the response time for mobile crisis calls, adding two to six hours to the response time when all teams are deployed. Stakeholders reported numerous mobile crisis no-shows following hotline calls, days-long delays in response time, and inability or unwillingness to send a team in response to a call placed near the end of business hours. Call volume for mobile crisis services, which already "fully outstrips" staffing response capacity, tripled between 2020 and 2021, and is expected to continue to increase.

Due to the insufficiency of current crisis services, State officials and the Children's Mental Health Consortia have identified sustainable funding of mobile crisis services as a priority.[46] Though the State has included crisis services in its Medicaid service array, Nevada

---

[44] Nevada Division of Public and Behavioral Health, *Towards a Comprehensive Crisis Response System in Nevada* 2 (2020), https://perma.cc/9WDA-42AQ

[45] Nevada also has two new, fledgling crisis programs: an engagement team to serve high-needs, system-involved youth under age 18 and a step-down team to serve youth re-entering the community from a residential setting. These programs are currently "very small," according to a State official. The step-down team was designed to serve only 12 children in its first year.

[46] All three Children's Mental Health Consortia have identified adequate and sustainable funding of mobile crisis services as a priority in recent reports. *See* Clark County Children's Mental Health Consortium, *2022 Service Priorities Report* 5-6, https://perma.cc/V5MJ-5RJ3f; Rural Children's Mental Health Consortium, *2021 Annual*

relies largely on State dollars to operate its mobile crisis services. Our review of a sample of children's records revealed that more than half of children who needed intensive support and had a residential treatment stay did not receive any crisis services funded by Medicaid during a five-year period. This suggests that the State may not be maximizing federal Medicaid match dollars for this service.[47]

Even for those children who are able to receive and benefit from MCRT, the unavailability of the needed array of community-based services limits the impact of mobile crisis. Although MCRT offers 60 days of outpatient stabilization services following a crisis call, without access to ongoing services such as intensive in-home services, therapy, respite care, and peer support, children are likely to remain mired in a cycle of crises. A parent who explained the limitations in MCRT's efficacy, explained that "if [your] child needs additional services, [MCRT] literally tell[s] you—[there are] no open beds, [there is] nowhere to refer you, [connecting to a service] will take weeks."

The lack of mobile crisis responses also leads to unnecessary interaction with police. In the words of a former foster parent, "I called mobile crisis because I thought the child I had was exhibiting mania, mobile crisis answered the phone and said, 'We close in 15 minutes, so we aren't going to send anyone out, but if it keeps happening, just call 911.'"

In addition to mobile crisis services, crisis stabilization services are vital to preventing unnecessary hospitalization and residential treatment. As acknowledged by Nevada, crisis stabilization can sometimes be achieved through ongoing, intensive in-home services. Other crisis stabilization services include "intensive short term, out of home resources for the child and family, helping to avert the need for psychiatric inpatient treatment. The goal is to address acute mental health needs and coordinate a successful return to the family at the earliest possible time with ongoing services."[48] The State, as well as county officials and advocates, have noted a need for in-home crisis services, peer-operated respite care, and short-term out-of-home crisis care.[49]

---

*Report* 7, https://perma.cc/JXS2-4FP3; Washoe County Children's Mental Health Consortium, *2020 Annual Report* 18, https://perma.cc/KWR9-2XCJ.

[47] In 2021, Nevada received emergency federal funding which has allowed for some expansion of mobile crisis services.

[48] Joint CMS and SAMHSA Informational Bulletin 5, https://perma.cc/R9QG-RMBA.

[49] The State recently amended its Medicaid Service Manual to encompass crisis stabilization centers, which are designed to "[d]e-escalate or stabilize a behavioral health crisis" and "[w]hen appropriate, avoid admission of a patient to another inpatient mental health facility or hospital and connect the patient with providers of ongoing care." Medicaid Services Manual, Section 403.6GI (March 30, 2022), https://perma.cc/9EUD-XWCV.

3.    Intensive Care Coordination is Not Available to Children Who Need It to Avoid Institutionalization

"Intensive care coordination includes assessment and service planning, accessing and arranging for services, [and] coordinating multiple services."[50]  Wraparound facilitation is a form of intensive care coordination, which "is a team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families."[51]  Through wraparound facilitation, each child has a child and family team "that includes the child, family members, involved providers, and key members of the child's formal and informal support network, including members from the child serving agencies."[52]  When implemented according to the national model, studies have shown that wraparound facilitation leads to positive outcomes and allows children to remain in the community.[53]

Nevada has embraced wraparound facilitation through Wraparound in Nevada (WIN). Intense care coordination offered through WIN is known as High Fidelity Wraparound[54] and is intended for children with the most complex mental health needs.

WIN served only 283 children in fiscal year 2020—fewer than the number of children served in residential treatment facilities in that year.  The number of children served dropped by nearly 60% between fiscal years 2017 and 2020.  Pay for WIN workers is low and there is high turnover, contributing to a staffing shortage.  Staffing shortages in turn have caused waitlists for WIN, including when children are being discharged from facility-based care and need care coordination to facilitate their return to the community.

According to State officials, children receiving High Fidelity Wraparound should be receiving community-based services, such as therapy, psychiatric care, and in-home behavioral health services, but in reality these children are often not connected to such services.  This is unsurprising given the dearth of community-based services.  One parent told us: "Wraparound doesn't really offer anything, they just try to connect you with different people.  But the problem with Nevada is there isn't a lot of services without a 6-18 month wait."  Concerns about WIN's effectiveness were echoed by high-level state officials.

---

[50] Joint CMS and SAMHSA Informational Bulletin 3, https://perma.cc/R9QG-RMBA.

[51] Id.

[52] Id.

[53] National Wraparound Initiative, *Wraparound Basics or What is Wraparound: An Introduction*, https://perma.cc/M73J-637Q; National Wraparound Initiative, *Rigorous Research on Wraparound's Effectiveness: Summary Document* (Oct. 2017), https://perma.cc/6Z69-Z3S6.

[54] We did not assess whether Nevada's approach to wraparound facilitation is consistent with the national model.

19

4.  <u>Nevada Does Not Make Available Respite, Therapeutic Foster Care, and Other Family-Based Supports Needed to Avoid Institutionalization</u>

In addition to intensive in-home services, other services such as respite and therapeutic foster care could prevent unnecessary residential treatment.  "Respite services are intended to assist children to live in their homes in the community by temporarily relieving the primary caregivers.  Respite services provide safe and supportive environments on a short-term basis for children with mental health disabilities when their families need relief."[55]  These services can provide caregivers a break without requiring children to enter segregated, institutional settings.  Many families told us that they needed respite services but they were unavailable.  State officials acknowledged the gap in and need for respite services.

For circumstances where a child cannot live at home, there is a need for an alternative family setting to prevent or shorten children's placement in residential treatment facilities.  Such an alternative can be either a traditional foster home with intensive services provided in the home, or therapeutic foster care, which is provided in the homes of  "foster parents with specialized training to care for a wide variety of children and adolescents, usually those with significant emotional, behavioral, or social issues or medical needs."[56]  Nevada offers a statewide Specialized Foster Care program for children in state or county custody, but this program does not appear to be sufficient as currently administered to meet the needs of children with significant needs.  During our investigation, we learned of numerous instances of children in foster care who were unnecessarily placed in segregated settings or forced to stay in such settings longer than necessary because of an inability to identify traditional or therapeutic foster homes that would accept them and meet their needs.  This has resulted in congregate child welfare settings and emergency shelters serving a high proportion of children with behavioral health disabilities.

Family-based supports may be particularly needed for families with adopted children.  We interviewed at least nine parents of adopted children who were in residential treatment facilities.  Staff from multiple residential treatment facilities reported serving a number of adopted children.  Families with adopted children with behavioral health disabilities in Nevada may have insufficient access to adoption-related counseling and other trauma-informed community-based services.

**B.  Nevada Fails to Provide Effective Oversight and Management of its Children's Behavioral Health System to Prevent Unnecessary Segregation**

Nevada administers its system in a way that leads to unnecessary segregation of children with behavioral health disabilities.  Among the actions that result in this segregation are Nevada's failure to (1) develop and maintain an adequate provider network for key services; (2)

---

[55] Joint CMS and SAMHSA Informational Bulletin 5, https://perma.cc/R9QG-RMBA.

[56] U.S. Dep't of Health and Human Servs., Admin. for Children and Families, Admin. on Children, Youth and Families, Children's Bureau, *Treatment Foster Care*, https://perma.cc/5PM2-SEDY.

connect children with behavioral health services and prevent admission to segregated settings; and (3) ensure adequate discharge planning to prevent unnecessarily long stays and readmissions.

    1.   <u>The State has Failed to Establish and Maintain a Sufficient Provider Network to Deliver Key Services</u>

Nevada has failed to ensure a sufficient provider network to deliver behavioral health services for children, resulting in a significant shortage in service providers for children at serious risk of residential placement. State agencies do not have good data on who is providing children's behavioral health services in the state, the needed capacity for community-based services, or the quality of services. High-level administrators in State government recognize that the State is failing to adequately oversee its community-based behavioral health system. The outgoing Administrator of DCFS told us that during his tenure "[a]ll of [DCFS's] quality and oversight functions were under-resourced to do the job." And State officials responsible for quality assurance acknowledged that new systems must be put in place in Nevada to adequately monitor and truly provide oversight.

As a result, the State does not provide sufficient guidance on the services or providers available to children with behavioral health disabilities. As the state official in charge of children's mental health told us: "Because the [children's mental health] system has never had true oversight or regulation, there isn't a database anywhere of what services exist." This makes it difficult for families to access services, as parents and guardians shoulder the burden of finding providers. It also means that clinicians are unable to match a child's level of need to an available service through an organized system. As one state facility official told us, if hospital staff had more information about community-based services, fewer children would require residential care.

Nevada's Medicaid policies impose additional challenges on accessing necessary services by restricting service utilization and provider participation. Limitations on the amount and frequency with which needed services can be delivered create barriers for children and families with intensive needs. According to the State, families attempting to access services frequently "struggle with navigating these systems and receive unexplained service denials."

Furthermore, challenges with Nevada Medicaid program requirements and reimbursement rates for community-based services result in a dearth of providers who will accept Medicaid.[57] The Administrator of DCFS told us that she did not believe that Nevada Medicaid, as it is currently administered, supported intensive in-home services. A high-level official at DHCFP, the agency responsible for Medicaid, agreed, recognizing that the Medicaid

---

[57] Funding also impacts the services provided directly by the State. As discussed above, many important services are state-funded services. These services suffer from significant capacity challenges that impact the number of children who can be served and the effectiveness of services that can be provided.

rates do not incentivize providers to offer the service; the Clark County Children's Mental Health Consortium has also recently recognized the importance of provider rates.[58]

Due to the lack of providers, parents are often unable to find behavioral health services for their children, or even providers who can evaluate children for behavioral health conditions. Parents also struggle to find providers that are culturally competent and speak the same language as the family. The provider shortage leads to waits of months or even years for assessments and services. This dynamic results in a crisis-driven system with missed opportunities to intervene when children present as needing help, sometimes resulting in emergency room admissions or hospitalizations. One parent told us that she could not find a provider who was taking new patients when she was concerned about her son's possible suicidal ideation. The same parent, when seeking a counselor for her daughter, searched for four months before she found one. Another parent told us that when her child was discharged, the parent was unable to get her child into outpatient therapy before her next hospitalization.

     2.   <u>The State Fails to Connect Children with Community-Based Behavioral Health Services and Avoid Their Admission to Segregated Settings</u>

The State also fails to intervene at critical intervention points to connect children to community-based services and prevent their admission to segregated settings. Nevada does not oversee the process to approve treatment in residential treatment facilities to ensure that, where possible, children are diverted from residential treatment. The State does not assess children seeking authorization for a residential treatment level of care funded by the State's Medicaid program and connect them to community-based services as an alternative, whenever appropriate. However, a high-level State official told us that it is the State's role to assess and divert children away from residential treatment.

Nevada also does not analyze data or information to learn what factors are driving residential placements. The State does not systematically assess the reasons why children are placed in residential treatment facilities. Without fully assessing why children are placed in residential treatment facilities, Nevada will be unable to prevent future unnecessary placements.

     3.   <u>The State Fails to Ensure Appropriate Discharge Planning to Prevent Unnecessarily Long Stays and Readmissions</u>

The State fails to ensure appropriate discharge planning from hospitals or residential treatment facilities. Insufficient discharge planning can contribute to longer-than-necessary stays and readmissions to hospitals or residential treatment facilities. As a State official acknowledged, discharge planning is critical to children's success upon return home. For state-run facilities, however, discharge planning is generally limited to making appointments with psychiatrists and therapists. Staff at out-of-state residential treatment facilities told us that the State does not participate in discharge planning from those facilities.

---

[58] Clark County Children's Mental Health Consortium, *2021 Status Report* 13, https://perma.cc/835Q-EXUK.

Parents of children receiving treatment in psychiatric hospitals, residential treatment facilities, detention centers, and emergency child welfare shelters overwhelmingly reported receiving insufficient assistance planning for and coordinating services to help their children avoid another hospitalization or residential placement. Indeed, stakeholders report that children are frequently discharged without medication or proper community-based services, which can cause a worsening of their symptoms. Compounding this, Nevada does not follow up with children who have recently received residential treatment to verify they are receiving community-based services or track outcomes.

## VII.    IT IS A REASONABLE MODIFICATION TO SERVE CHILDREN WITH BEHAVIORAL HEALTH DISABILITIES IN THE COMMUNITY

States must reasonably modify their service systems to avoid discrimination on the basis of disability.[59] Nevada could reasonably modify its existing community-based programs, without fundamentally altering its current system, to prevent unnecessary segregation of children with behavioral health disabilities. Such modifications would allow children to live and thrive in their own homes and communities instead of entering or remaining in institutions to access appropriate care.

Nevada has established many of the basic components of the service array that can prevent unnecessary institutionalization for children with behavioral health disabilities, if offered throughout the state at the intensity level required to meet these children's needs. For example, Nevada provides mobile crisis and care coordination to some children. In addition, the State has included components of intensive-in home services in its Medicaid service array. Nevada officials have acknowledged the importance of these services for children in preventing institutional placement, and they have expressed an intention to expand them. Indeed, Nevada has created specialized programs to address its deficient community-based behavioral health system, but these programs are limited in scope and insufficient to address Nevada's overuse of segregated settings.[60] Courts have found that expansions of existing state programs are reasonable modifications, especially when they are consistent with the jurisdiction's plans and obligations.[61]

---

[59] See 28 C.F.R. § 35.130(b)(7)(i); Olmstead v. L.C., 527 U.S. 581, 607 (1999).

[60] For example, Nevada recently created two new specialized mobile crisis programs, see supra n.45, which are limited in the number of children served. In 2020, Nevada also received approval from CMS for a § 1915(i) state plan amendment regarding children's behavioral health services. However, the § 1915(i) is a new program that is focused only on children in specialized foster care and covers fewer services than the State acknowledges are needed. Nevada also has a federal System of Care Expansion and Sustainability Grant that aims to improve services in the rural regions of the state. Nevada has also invested in Certified Community Behavioral Health Clinics in an effort to expand behavioral health access throughout the State. However, State officials told us that the program is currently serving few children.

[61] See supra n.14.

Nevada spends significant resources on hospitalization and residential treatment for children with behavioral health disabilities. Publicly reported data shows that Nevada spends approximately $11,000 per child for each month in a residential treatment facility; from March 2020 to March 2021, Nevada spent a total of over $38 million on residential treatment facility services for children.[62] We reviewed five years of Medicaid claims data of a random sample of children who had received treatment in residential treatment facilities, and we found that over 80% of spending on behavioral health services for these children was for hospital or residential services. Because community-based services are less expensive than residential services, shifting spending toward community-based services is both reasonable and more cost-effective.

Additionally, as noted above, the Early and Periodic Screening, Diagnostic and Treatment (EPSDT) provisions of the Medicaid Act require that Nevada's Medicaid program provide children under the age of 21 with any services coverable under the Medicaid Act necessary to correct or ameliorate a mental illness or condition. The State must provide these services, including community-based behavioral health treatment, to the extent they are medically necessary.[63] Though Nevada's Medicaid program includes some community-based services, many children who need the services to avoid institutionalization cannot access them in sufficient intensity to meet their needs. It is a reasonable modification for Nevada to provide these services in the amount medically necessary, given the State's pre-existing obligation under the Medicaid program.

Nevada could serve children in the most integrated setting appropriate to their needs and comply with Title II of the ADA by reasonably modifying its service system. Remedial measures should include:

- **Ensuring that community-based services are accessible and available with sufficient intensity to prevent unnecessary institutionalization.** Services the State should ensure are available and accessible include intensive in-home supports and services, intensive care coordination, crisis response, peer support, therapeutic foster care, and respite. The State should consider input from children and families with lived experience in expanding its service array.

- **Ensuring that the array of services is available statewide as required by Medicaid.** The State should adjust rules and procedures to facilitate the participation of children's behavioral health providers in Medicaid. The State should conduct a rate analysis of its Medicaid rates and adjust its rates if needed to allow for robust provider participation in community-based behavioral health services.

---

[62] Nevada Division of Health Care Financing and Policy, *BHS – Out of State Residential Treatment Center Reports* 6, https://perma.cc/BY5N-FSHJ.

[63] *See* 42 U.S.C. § 1396d(r)(5).

- **Exercising robust oversight of community-based providers**. The State should ensure that community-based behavioral health services are of sufficient quality to allow children with significant behavioral health disabilities to remain in their homes and communities, where appropriate.

- **Assessing children at serious risk of institutional placement for community-based services and quickly connecting them to appropriate services.** The State should assess and connect children and families to services when needed, such as when they experience a crisis, are referred to WIN, are hospitalized, or are referred to residential treatment facilities. The State should closely manage the process of approving residential treatment, including by examining data associated with residential admissions to make system improvements.

- **Working with children and families when a child enters a segregated setting to facilitate discharge and transition back to the community.** Discharge planning work should begin at admission. The State should ensure that children have access to sufficient community-based services upon discharge and that discharges are not delayed by inadequacy of services.

## VIII.    CONCLUSION

For the foregoing reasons, we conclude that there is reasonable cause to believe the State fails to provide services to children with behavioral health disabilities in the most integrated setting appropriate, in violation of the ADA.[64] Because of deficiencies in its community-based service array and the manner in which the State administers its children's behavioral health system, the State relies on segregated settings to serve children with behavioral health disabilities who could be served in their homes and communities.

We look forward to working cooperatively with the State to reach a resolution of our findings. We are obligated to advise you that if we are unable to reach a resolution, the United States may take appropriate action, including initiation of a lawsuit, to ensure the State's compliance with the ADA. Please also note that this Report is a public document. It will be posted on the Civil Rights Division's website.

---

[64] *See* 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).