**AGREEMENT BETWEEN THE UNITED STATES AND THE STATE OF NEVADA**

## I.     INTRODUCTION

A.      In December 2020, the United States Department of Justice ("the United States") initiated an investigation under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. and its implementing regulations, of Nevada's service system for Children with Behavioral Health Disabilities.

B.      On October 4, 2022, the United States issued a findings report notifying the State of its conclusion that the State does not comply with Title II of the ADA, as interpreted in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581 (1999). This Agreement resolves pending issues between the United States and the State ("the Parties") concerning the United States' investigation of Nevada's service system for Children with Behavioral Health Disabilities.

C.      The Parties are committed to full compliance with the ADA. This Agreement is intended to advance the State's compliance with the ADA and to ensure that services, programs, and activities offered by the State to Children in the Focus Population will be provided in the most integrated setting appropriate to meet their needs, consistent with Olmstead v. L.C. Implementation of this Agreement will operate under the presumption that these Children can be served in the community, if provided with adequate supports.

D.      The purpose of this Agreement is to prevent Children in the Focus Population from being needlessly removed from their family home to obtain treatment, to prevent those Children from unnecessarily entering Hospitals and Residential Treatment Facilities, and to transition Children in the Focus Population who have been placed in these settings back to their family homes and communities with needed services when appropriate. The goal of the Agreement is to develop a strengthened system of community-based services that effectively engages families in service planning and ensures coordinated and family-centered care so that Children in the Focus Population can receive flexible services and supports that are of sufficient intensity, duration, and quality to meet their behavioral health needs.  The Agreement is intended to ensure that Children in the Focus Population receive sufficient services to prevent unnecessary institutionalization and live at home with Family (or foster or kinship care Family, where applicable), support success in school, enhance their community living skills and resiliency, and

contribute toward the development of the skills to function independently upon reaching adulthood.

 E. The Parties intend that the policies, procedures, and services developed under this Agreement will be Family-driven, Child-guided, and culturally and linguistically competent, and the services provided under this Agreement will be individualized and strengths-based. The State will also measure meaningful outcomes and use them to improve the quality of care.

 F. The Effective Date will be the date upon which this Agreement is executed by both Parties.

## II.  DEFINITIONS

 A. "Behavioral Health Disability" is a Serious Emotional Disturbance, Serious Mental Illness, and/or Substance Use Disorder.

 B. "Behavioral Support Services" are services that are designed to help a Child in the Focus Population be successful in their home environment and their community, address behaviors that interfere with successful functioning in the home and community, and facilitate community integration by providing skills development for the Family and Child. These services can include: a behavioral assessment; modeling for the Family and other caregivers how to implement strategies for addressing the Child's behaviors; and therapeutic mentoring, which is a structured, one-to-one, strengths-based support to a Child in the home or community for the purpose of teaching skills addressing daily living, social, and communication needs in the Child's natural environment. These services are coordinated with the goals identified in the Child's Plan of Care and, where appropriate, supervised by the Child's therapist to help the Child and Family achieve treatment goals. Behavioral Support Services may include the Nevada Medicaid services Basic Skills Training or Psychosocial Rehabilitation Services.

 C. "Child and Family Team" is a group of individuals, chosen with the Family of a Child in the Focus Population and connected to them through natural, community, and formal support relationships, that develops and implements the Plan of Care. The Child and Family Team is led by the Wraparound Facilitator. The Child and Family Team includes the Child and Family, a Wraparound Facilitator, relevant service providers, educators, and, where desired by the Child or Family, any additional formal or natural supports. The Child in the Focus Population and Family are active members of the Child and Family Team and partners in service planning

and coordination, including in the identification of resources that could help the Child live with Family, have success in school, enhance community living skills and resiliency, and develop the skills to function independently upon reaching adulthood.

D.      "Child" or "Children" are individuals under the age of 21.

E.      "Clinical Assessment Tool" is a standardized, validated, and evidence-based mental health assessment tool of a Child's functioning and identified needs and strengths across crucial life domains and is used to inform decisions about level of care, and the type and intensity of services.  The Clinical Assessment Tool(s) will be selected by the State after receiving feedback from community partners, the United States, and the Independent Reviewer.

F.      "Comprehensive Assessment" is an evaluation completed by a Qualified Mental Health Professional of a Child's presenting behavioral health concern(s) and the Child's history and functioning. The Comprehensive Assessment includes identification and diagnosis of any Behavioral Health Disability; identification of any co-occurring diagnoses; and identification of the Child and Family's strengths, needs, family history, and culture through utilization of a clinical interview with the Child and Family.  The Comprehensive Assessment may include consideration of available records from other behavioral health care providers and from school when applicable. The Comprehensive Assessment should include completion of a Clinical Assessment Tool, identification of initial goals, and recommendations for frequency and intensity of needed behavioral health services to meet the needs of the Child to remain in or return to the community.

G.      "Crisis Plan" is an individualized plan that identifies strategies, supports, and services that the Child and Family Team and any other providers or supports will use to anticipate, prevent, and effectively respond to crises. The Crisis Plan can also be referred to as a safety and soothing plan.

H.      "Family" means biological parents, adoptive parents, kinship caregivers (including both relatives and fictive kin), or other guardians or custodians of a Child.

I.      "Family Peer Support" is a service that connects the Family of a Child in the Focus Population with behavioral health needs with another Family with lived experience caring for a Child with behavioral health needs for supportive services. These services include providing emotional support, connecting the Family to community services, promoting parental

3

self-care and resiliency skills, and helping the Family navigate the processes for accessing resources.

J.      "Family Therapy" is a mental health treatment service provided to a Child in the Focus Population and Family by a qualified mental health professional for the purpose of effectively addressing the Child's behavioral health needs, improving the Family's ability to provide effective support for the Child, and facilitating positive interactions among Family members. The Child does not have to be present; however, the services provided will target issues relating to the constructive integration/reintegration of the Child into the Family.

K.      "Focus Population" is the population of Children served by this Agreement. A Child in the Focus Population is a Medicaid-eligible Child who has a Behavioral Health Disability; and

    a.  is in a Hospital or Residential Treatment Facility; or

    b.  meets at least one of the following criteria:

        1.  is referred to, seeks authorization for, or is discharged from a Hospital or Residential Treatment Facility;

        2.  receives a score on a Clinical Assessment Tool that indicates eligibility for hospitalization in a Hospital or a Residential Treatment Facility placement;

        3.  receives Mobile Crisis Response and Stabilization Services three or more times within a twelve-month period;

        4.  is released from a county juvenile detention center or state Youth Parole Youth Center and receives a score on a Clinical Assessment Tool that indicates the Child is at risk for hospitalization in a Hospital or Residential Treatment Facility services; or

        5.  has been in a child welfare emergency shelter care for more than 7 days and receives a score on a Clinical Assessment Tool that indicates the Child is at risk for hospitalization in a Hospital or Residential Treatment Facility services.

For the purposes of this Agreement, all services with the exception of Screening, Assessment, and Mobile Crisis Response and Stabilization Services apply only to Children in the Focus Population.

L.      "Home- and Community-Based Services" at a minimum include Intensive In-Home Services and Mobile Crisis Response and Stabilization Services, and are provided in the Child's home or the community.

M.      "Hospitals" mean 24-hour acute treatment and diagnostic group care settings for Children admitted for psychiatric care.

N.      "Individual Therapy" is a direct one-on-one, structured, and strengths-based mental health service provided to the Child in the Focus Population for the purpose of addressing a presenting behavioral health need by an individual therapist.

O.      "Intensive Care Coordination" is a service that coordinates all formal and informal supports and services delivered to a Child in the Focus Population. Intensive Care Coordination includes development of the Plan of Care and referral and linkage to and coordination with appropriate services, based on the Comprehensive Assessment and the Plan of Care.

P.      "Intensive Care Coordinator" is an individual who is trained to work in a strengths-based manner to develop a Plan of Care for a Child in the Focus Population, in coordination with the Child and Family, and who supports referral, linkage and coordination between identified services.

Q.      "Intensive In-Home Services" are a coordinated set of highly engaging and supportive services provided in any setting in which the Child in the Focus Population is naturally located, such as the home, school, or other community setting.  These services include Wraparound Facilitation, Respite Care, Individual Therapy, Family Therapy, Behavioral Support Services, Family Peer Support, and Youth Peer Support.  These services are implemented to address the recommendations of, and in furtherance of the goals described in, the Plan of Care.

R.      "Mobile Crisis Response Team" is a team of two individuals to include a master's level Qualified Mental Health Professional and a second team member who may be another professional or a paraprofessional (which may include Family and Youth Peer Support) who provide mobile crisis response and stabilization services.

S.      "Plan of Care" is a comprehensive, individualized plan that outlines treatment goals for the Child in the Focus Population and a plan for achieving those goals. The Plan of Care will be informed by the Comprehensive Assessment and any other assessments, and take into consideration the strengths, culture, and needs of the Child and Family and be signed by the

Family. The Plan of Care should at a minimum, identify 1) supports and services available to the Family, 2) the frequency with which certain services should be provided to the Child and a plan for necessary transportation, and 3) any referrals necessary to specific providers and resources in support of the Plan of Care.

T.    "Residential Treatment Facilities" are structured 24-hour non-acute group care treatment settings for Children with significant behavioral health needs.  Residential Treatment Facilities include, but are not limited to, Residential Treatment Centers, Psychiatric Residential Treatment Facilities (PRTFs), Qualified Residential Treatment Programs (QRTPs), and Intermediate Care Facilities.

U.    "Respite Care" provides Families with short-term care for a Child in the Focus Population by natural supports or formal providers.  Respite Care offers temporary relief, improves Family stability, and reduces the risk of abuse or neglect. Respite Care can be planned or offered during emergencies or times of crisis to the Family of a Child in the Focus Population. It may be provided in the Child's home or in other homes or home-like settings.

V.    "Serious Emotional Disturbance (SED)" refers to a diagnosable mental, behavioral, or emotional disorder in the past year, which resulted in functional impairment that substantially interferes with or limits the Child's role or functioning in Family, school, or community activities and is a term used for Children under the age of 18.

W.    "Serious Mental Illness (SMI)" refers to a diagnosable mental, behavior, or emotional disorder within the past year that causes serious functional impairment that substantially interferes with or limits one or more major life activities and is a term used for adults over the age of 18.

X.    "Specialty Managed Care Plan" is a Medicaid managed care entity or entities that the State contracts with to meet the unique needs of Children in the Focus Population and Children in the foster care system. Through this arrangement, the State's Medicaid program will require this entity or entities to develop a sufficient network of providers to deliver and manage the full Medicaid benefit set for this population in addition to certain targeted benefits for this population, such as home and community-based services, specialized care coordination and care management, and screening, among other benefits as outlined in this Agreement. The Plan will also be required to meet specific reporting requirements and quality measures beyond what is typically offered in a standard Medicaid managed care program.  The Plan may also subcontract

certain services including case management to other public or private entities as long as the requirements of the Agreement are met for the Focus Population. The Plan will require that subcontractors report on compliance requirements and quality metrics on a regular basis.

Y.      "State" is the State of Nevada, Department of Health and Human Services, or any successor agencies with responsibility for providing or having oversight over services in this Agreement.

Z.      "Substance Use Disorder" is a disorder diagnosed by a Qualified Mental Health Professional, pursuant to the current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM), that results from the recurrent use of alcohol and/or drugs and that causes clinically significant impairment, including health problems, disability, and failure to meet major responsibilities at work, school, or home.

AA.     "Supported Employment" is a model that provides young people ages 16-20 with a Behavioral Health Disability in the Focus Population ongoing support for success in a competitive work environment. This can include assistance with preparing for, identifying, attaining, and maintaining integrated, paid, competitive employment.

BB.     "Trauma-Informed" is an approach to care and treatment that takes into consideration the impact of trauma and understands the potential paths for recovery from trauma with respect to behavioral health. This approach also recognizes the signs and symptoms of trauma and responds by fully integrating knowledge about trauma into policies, procedures, and practices, and seeks to actively resist re-traumatization. This approach incorporates Trauma-Informed principles, which include safety; trustworthiness and transparency; peer support; collaboration and mutuality, including partnering and leveling of power differences between providers and people receiving services; empowerment, voice and choice; and recognition of cultural, historical and gender issues.

CC.     "Wraparound Facilitation" is a benefit that facilitates comprehensive care planning and coordination for a Child in the Focus Population. The benefit is based on a structured approach to service planning and coordination and includes the following service components: (1) meetings with Child and Family Teams for assessing needs in support of the service delivery process; (2) state and local provider and agency collaboration to develop the supports to ensure the Child's success in the home and community; and (3) strengths-based planning and facilitation to assist the Child and Family Team with the Child's care.

DD.    "Wraparound Facilitator" is an individual who is certified to facilitate the high-intensity, high-frequency Wraparound intervention to Families and Children in the Focus Population with complex needs, who guides team development and oversees the process and tasks of the team in order to develop and implement a comprehensive Plan of Care to ensure that Children in the Focus Population are able to remain in their homes, schools and communities.

EE.    "Youth Peer Support" is a service that connects youth peers in their community in a mutual relationship of shared empathy and demonstrated resiliency. Youth Peer Support provides the support, validation, and encouragement necessary for Children in the Focus Population to effectively engage with their support systems. Youth Peer Support Specialists use their recovery experience to provide support to other Children in the Focus Population working through their own recovery and treatment. The service components include emotional support, connecting the Child in the Focus Population to community services, promoting self-care and resiliency skills, and helping the Child navigate the process of treatment and access community resources.

### III. SCREENING AND ASSESSMENT TO IDENTIFY CHILDREN IN THE FOCUS POPULATION

1.    The State will oversee a toll-free phone line and website where individuals can receive information about Home- and Community-Based Services and through which Children and families can request to be connected for screening for such services.  The phone line will be staffed between 8 am and 9 pm, 7 days a week.  Urgent website requests for Home- and Community-Based Services will be responded to as soon as practicable but no later than within one business day; all other website requests will be responded to within 3 business days. The State will develop protocols to ensure that any calls from Children and Families experiencing an active crisis are transferred to the crisis hotline described in this Agreement.  The toll-free phone line will be available to all Children under age 21 and their Families, regardless of Medicaid eligibility and regardless of whether the Children fall within the Focus Population.

2.    The State will adopt a set of behavioral health screening tools that are nationally recognized or validated tools that are brief, mental health specific, and developmentally appropriate.

3.    The State will establish and monitor compliance with timeliness standards for completion of screenings.  The timeliness standards will be established by the State after

receiving and considering feedback from community partners, service providers, the United States, the Centers for Medicare & Medicaid Services (CMS), and the Independent Reviewer.

4.    The State will ensure that a screening tool is completed for any Child not already known to be receiving behavioral health services when the Child begins receiving services through State of Nevada Department of Health and Human Services child welfare, juvenile justice, or developmental services programs.

5.    The State will develop collaborative agreements with county entities so that the counties use the screening tools adopted pursuant to this Section to screen Children who enter a juvenile detention facility or foster care shelter within established timeliness standards guidelines.  The State will monitor compliance following establishment of these collaborative agreements.

6.    The State will establish a new requirement that Children within its Medicaid program receive periodic screening using the screening tool(s).  The State will monitor compliance following establishment of this requirement.

7.    The State will establish and monitor compliance with protocols for referral for a screening if a Child or Family requests Home- and Community-Based Services through the toll-free line or website.

8.    The State will establish and monitor compliance with requirements to conduct Comprehensive Assessments for Medicaid-eligible Children in the following populations:

   a.    Children who have been referred to or sought authorization for Residential Treatment Facility services;

   b.    Children who receive Mobile Crisis Response and Stabilization Services;

   c.    Children who have been admitted to a Hospital for treatment of a Behavioral Health Disability;

   d.    Children who have sought care in an emergency department for treatment of a Behavioral Health Disability; and

   e.    all other Children whose screening indicated a need for further assessment.

9.    For Children who are not Medicaid-eligible but whose screening indicated a need for further assessment, they will be referred for such assessment.

10.    The State will establish and monitor compliance with timeliness standards for completion of Comprehensive Assessments for Medicaid-eligible Children.  The timeliness

standards will be established by the State after receiving and considering feedback from community partners, service providers, the United States, CMS, and the Independent Reviewer.

11.     The Comprehensive Assessment for Medicaid-eligible Children will be conducted by a Qualified Mental Health Professional.

12.     If the Comprehensive Assessment for Medicaid-eligible Children identifies that a Child may have a co-occurring Intellectual or Developmental Disability (IDD), the Child will be referred for an IDD evaluation and services as needed.

13.     Any component of the Comprehensive Assessment for Medicaid-eligible Children that has been completed within 90 days of the referral for Assessment need not be repeated unless there has been a significant change in condition or circumstance.

14.     The Family of a Medicaid eligible Child will be offered a referral to a Family Peer Support specialist agency or entity that employs Family Peer Support, through in-person and/or phone or internet contacts, if the Child is scheduled for a Comprehensive Assessment. The Family Peer Support specialist will be allowed to participate at the Child's or Family's request to assist in engaging the Family during the assessment process.

15.     Medicaid-eligible Children will not be required to wait for the completion of a Comprehensive Assessment to access crisis stabilization services or any other urgently needed services that can be delivered prior to the completion of the Comprehensive Assessment.

16.     The screening process and Comprehensive Assessments will assist the State in identifying Focus Population Members.

17.     The Focus Population for this Agreement will be all Children who meet the definition of Focus Population based on a qualifying event that occurred on or after the Effective Date.  Children will remain in the Focus Population for at least one year following each qualifying event, except that Children who no longer meet criteria due to loss of Medicaid eligibility or turning 21 within one year of entering the Focus Population will exit the Focus Population upon that event.

18.     Children who are assessed and found to not need the services in this Agreement, and Children who exit the Focus Population due to loss of Medicaid eligibility or turning 21, will be referred and linked to other behavioral health, social, and/or community services as needed.

19.     Children are not excluded from the Focus Population because of a co-occurring diagnosis of IDD.

## IV. SERVICE PLANNING AND COORDINATION

20.     Children in the Focus Population will be offered Wraparound Facilitation.  If they decline Wraparound Facilitation, they will be offered Intensive Care Coordination services as an alternative to assist the Child and Family with accessing available services, including available Home- and Community-Based Services. The State will track the reasons why families decline Wraparound Facilitation.

21.     The State will expand capacity for Wraparound Facilitation and Intensive Care Coordination to support home and community living for Children in the Focus Population.  To ensure capacity meets the needs, the State will monitor the accessibility and utilization of Wraparound Facilitation and Intensive Care Coordination to Children in the Focus Population and take appropriate action if those Children are not receiving Wraparound Facilitation or Intensive Care Coordination, according to their needs as identified in their Plans of Care.

22.     The State will establish and monitor compliance with timeliness standards for service planning and delivery of Wraparound Facilitation and Intensive Care Coordination.  The timeliness standards will be established by the State after receiving and considering feedback from community partners, service providers, the United States, CMS, and the Independent Reviewer.

23.     The Wraparound Facilitator will assemble, convene, and support the Child and Family Team, who will manage the Plan of Care for Children in the Focus Population.  The Wraparound Facilitator will be trained in the practices set forth by the National Wraparound Initiative and will lead the Child and Family Team in accordance with those practices.  If these guidelines are revised or deemed outdated at any point during the pendency of this Agreement, the parties will meet and confer to determine whether to make any changes to these services.

24.     The Wraparound Facilitator will work with the other members of the Child and Family Team to identify and ensure the provision of services and supports needed to successfully maintain or return the Child in the Focus Population to their Family and community.

25.     Wraparound Facilitators will have caseloads no greater than ten Children in the Focus Population per Wraparound Facilitator, with the exception of any short-term need to ensure that a Child and Family currently receiving Wraparound Facilitation does not experience a gap in this service due to staffing shortage.

11

26.    The Child and Family Team or Intensive Care Coordinator will be responsible for developing, monitoring, and updating a Plan of Care and Crisis Plan for the Children in the Focus Population. The initial Plan of Care will be finalized within 30 days of the first meeting between the Child, their Family, and the Wraparound Facilitator, or of the assignment of the Intensive Care Coordinator. The Child and Family Team will meet regularly and will update the Plan of Care and Crisis Plan at least every 90 days, and after any significant change in circumstance. For Children in the Focus Population with Intensive Care Coordination, the Intensive Care Coordinator will update the Plan of Care and Crisis Plan at least every 90 days, and after any significant change in circumstance.

27.    For Children in the Focus Population with IDD, services related to IDD will be included in the Child's Plan of Care and coordinated by the Child and Family Team or Intensive Care Coordinator.

28.    The Child and Family Team, led by the Wraparound Facilitator, will work within the Team to resolve any differences among Team members regarding needed services, guided by the preferences of the Child in the Focus Population and their Family.

29.    The Child and Family Team or Intensive Care Coordinator will refer Children in the Focus Population to providers to initiate services identified in the Child's Plan of Care.

30.    The Child and Family Team or Intensive Care Coordinator will ensure that Children in the Focus Population with an immediate need for intensive Home- and Community-Based services can access those services or any other similar services available in Medicaid to support home and community living while the Plan of Care is being developed.

31.    The State will require that providers initiate services identified in a Child in the Focus Population's Plan of Care within the timeframes set forth in the established timeliness standards.  The State will take appropriate action to ensure compliance is met.

32.    The State will ensure that Plans of Care are available to members of Child and Family Teams and appropriate crisis service providers, subject to the consent of the Family.

33.    Recognizing the need to support Children in the Focus Population ages 18-20 during transition to adulthood, the State will offer the option of Assertive Community Treatment in place of Wraparound Facilitation or Intensive Care Coordination, where available and if appropriate.

## V.  HOME AND COMMUNITY-BASED SERVICES

### A.    General Requirements

34.    The State will cover Home- and Community-Based Services in its Medicaid program to address the needs of the Focus Population.  The State will expand capacity for Home and Community-Based Services to support home and community living for Children in the Focus Population.  To ensure the capacity meets the need, the State will monitor the accessibility and utilization of Home- and Community-Based Services to Children in the Focus Population and take appropriate action if the Children are not receiving Home- and Community-Based Services, according to their needs as identified in their Plans of Care.

35.    These services will be offered in the home and community, Child- and Family-centered, individualized to the Child's and the Family's strengths and needs, of sufficient quality, and available and accessible statewide to all Children in the Focus Population in the necessary amount, location, and duration.

36.    The goals of Home- and Community-Based Services will be to help Children in the Focus Population build the skills necessary to function successfully in the home, improve the Family's capacity to help the Children develop such skills, and to prevent crises and promote stability in the home.

37.    The State will establish and monitor compliance with timeliness standards for delivery of Home- and Community-Based Services.  The timeliness standards will be established by the State after receiving and considering feedback from community partners, service providers, the United States, CMS, and the Independent Reviewer.

38.    The State will require providers of Home- and Community-Based Services to deliver services at times and locations mutually agreed upon by the provider and the Children in the Focus Population and their Families and during times of the day that meet the needs of the Children and their Families, such as after school and on weekends, as necessary and to the extent practicable.  The State will monitor compliance with these requirements and take appropriate action to ensure compliance is met.

39.    The State Medicaid program will cover transportation for the Children in the Focus Population and their Families to and from home for Home- and Community-Based Services that are provided outside the home setting.

40. The State will create or revise Medicaid reimbursement methodologies and workforce development strategies to increase provider capacity for providing Home- and Community-Based Services so that the Focus Population can access these services.

41. The State will provide Children in the Focus Population and their Families with accurate, timely, and accessible information regarding the available Home- and Community-Based Services in their communities.

42. Children in the Focus Population and their Families will have the right to choose whether and when to receive any of the Home- and Community-Based Services and to choose among available providers enrolled in the State's Medicaid program.

43. To the extent permitted under federal law for purposes of Medicaid reimbursement, the State will permit Families of Children in the Focus Population to access desired services in addition to the Home- and Community-Based Services described in this Agreement, such as services for IDD. If Children in the Focus Population receive services other than those listed in this Agreement, the Wraparound Facilitator will include those services in the Plan of Care and coordinate care where needed.

44. The State will establish policies for Home- and Community-Based Services that require providers to render services in a manner that is Trauma-Informed and culturally and linguistically appropriate; and provided in a manner that is safe, inclusive, and free from bias and discrimination. The State will monitor compliance with these requirements and take appropriate action to ensure compliance is met.

45. The State will continue to offer Specialized Foster Care pursuant to the requirements of Nevada Revised Statutes Chapter 424. Children in the Focus Population who are placed in Specialized Foster Homes (as defined by NRS 424.018) will also have access to Home- and Community-Based Services appropriate to meet their needs. Wraparound Facilitators and/or Intensive Care Coordinators should involve Specialized Foster Care parents and agencies in the development of the Plan of Care and/or the coordination of services as appropriate.

46. As a condition of payment in Medicaid, the State will require that all providers of Home- and Community-Based Services for Children in the Focus Population comply with state licensure and certification requirements and render services in a manner that is within their scope of practice under state law. For providers without a licensing board or certification agency, the

State will develop a state-approved certification process to ensure these providers are appropriately trained and qualified to render specific Home- and Community-Based Services to the Focus Population.

**B.    Mobile Crisis Response and Stabilization Services**

47.    The State will make a crisis hotline, Mobile Crisis Response Teams, and Mobile Crisis Response and Stabilization Services available to all Children under age 21 experiencing a behavioral health crisis regardless of Medicaid eligibility and regardless of whether they fall within the Focus Population.  These services will be offered in alignment with the practices outlined in the Substance Abuse and Mental Health Services Administration (SAMHSA) guidance document titled National Guidelines for Child and Youth Behavioral Crisis Care (2022).  If these guidelines are superseded at any point during the pendency of this Agreement, the parties will meet and confer to determine whether to make any changes to these services.

48.    The State will ensure that the crisis hotline is available throughout the state and staffed 24 hours per day, 7 days per week, including holidays.  The State will establish quality assurance and oversight measures to ensure that calls to the hotline are answered live and not sent to a message system.  The crisis hotline will have protocols and resources in place to quickly access translation services if there are no staff available with fluency in a caller's preferred language.

49.    The crisis hotline will:

a.    Be staffed by clinical and paraprofessional behavioral health staff that have specialized training to meet the needs of Children, including Qualified Mental Health Professionals and paraprofessionals (which may include Family and Youth Peer Support);

b.    Operate using the principle that crisis is defined by the Child and Family and is unique to that individual Child and Family;

c.    Offer a response that is driven by the Child and/or Family rather than by criteria, lists, rubrics, or the discretion of hotline staff;

d.    Use a developmentally appropriate, brief screening to gather presenting concerns, assess for safety and risk, and obtain basic demographic information;

e.    Include the Child and/or Family in decision-making regarding mobile response

services beginning at the initial contact;

f.  Share, when available and when the Family consents, the Crisis Plan, and/or Plan of Care with the Mobile Crisis Response Teams working with the Child and Family;

g.  Deploy a Mobile Crisis Response Team to the Family's location of choice;

h.  Assist with immediate stabilization efforts if needed before a Mobile Crisis Response Team arrives;

i.  Help the caller identify and connect with needed local services when they do not want Mobile Crisis Response and Stabilization Services, to include warm handoffs and assistance in securing appointments with a local provider when possible; and

j.  Receive warm hand offs from the 988 system for Children in crisis who enter through that hotline and are in need of Mobile Crisis Response and Stabilization Services.  Hotline staff will assist in supporting the Child and Family and in connecting the Child and Family to Mobile Crisis Response and Stabilization Services.

50.  After a Mobile Crisis Response Team is assigned, the Mobile Crisis services offered to the Child and Family will be comprised of two separate and distinct phases: response and stabilization.

a.  The initial crisis response phase supports a Child and Family through rapid engagement, assessment, and intervention to address the presenting crisis concerns and stressors, de-escalate the situation, assess for safety, and assist the Child and Family in creating and implementing a Crisis Plan that enables a Family to manage a crisis, move beyond the crisis, and avoid future crises.  The initial response phase may last up to 72 hours.

b.  The stabilization phase, which follows the initial crisis response phase, supports the Child and Family using in-home and community clinical interventions and/or with service planning and coordination, which establish connections for the Child and Family to community supports.  Services in the stabilization phase will be driven by the Child's and Family's needs and may include, but are not limited to: ongoing crisis counseling; assistance in implementing safety and soothing plans;

service planning; and providing resources and information on relevant services. Consistent with Child and Family needs, the stabilization phase may last up to 60 days.

51. Mobile Crisis Response Teams will respond at the Family's location of choice within the time frames set forth in this Agreement:

a. In Urban Clark (Cities of Las Vegas, North Las Vegas and Henderson) and Urban Washoe (Cities of Reno and Sparks) Counties and within any other urban area served by a Certified Community Behavioral Health Clinic (CCBHC), responses will be conducted face to face and in person, with an average response time within one hour for urgent responses.

b. Within areas of Clark and Washoe Counties not covered by subparagraph (a), and within CCBHC service areas in rural and frontier areas, responses will be conducted face to face and in person with an average response time within two hours for urgent responses. For urgent responses where remote travel distances make the 2-hour response time unachievable, telehealth may be used to provide crisis care to Children, but the ability to provide an in-person response must be available when it is necessary to assure safety.

c. In all areas of Nevada not covered by subparagraphs (a) or (b), responses may be conducted via telehealth or through a hybrid in-person/telehealth response model. Telehealth and hybrid responses in these locations will be initiated as soon as possible, but within one hour for urgent responses.

52. Consistent with Paragraph 49.h, the crisis hotline will assist with immediate stabilization. For all in-person responses, either the crisis hotline or a member of a Mobile Crisis Response Team will provide telehealth stabilization support as needed to Children and their Families in crisis during the Mobile Crisis Response interim travel time. The crisis hotline will connect Children in crisis with telehealth response in the event no Mobile Crisis Response Team in the service area is available.

53. For purposes of this Agreement, responses will be considered urgent when the Child in the Focus Population or their Family calls mobile crisis and identifies an immediate need for assistance.

54. The State will work to develop additional in-person crisis response capacity and to expand capacity of the CCBHC teams to provide in person responses within timeline standards in their assigned service areas.

55. Mobile Crisis Response Teams will consist of two individuals to include a Qualified Mental Health Professional and a second team member who may be another professional or a paraprofessional (which may include Family or Youth Peer Support).

56. The State will identify standardized screening and assessment tools for use by Mobile Crisis Response Teams.

57. Mobile Crisis Response Teams will work collaboratively with a Child and Family to create a Crisis Plan at the initial response. Crisis Plans should be reviewed at every contact and updated as needed. Crisis Plans should become part of a Child's Plan of Care.

58. Where the Child does not have a Child and Family Team, the Mobile Crisis Response Team will provide referrals and assist families with securing appointments for services as needed.

59. Mobile Crisis Response Teams will develop relationships and collaborative agreements with local emergency dispatch services and law enforcement to promote use of crisis hotline and Mobile Crisis Response Teams instead of law enforcement for Children in behavioral health crisis whenever possible. The State will develop and implement guidance for Mobile Crisis Response Teams to use in determining whether to call 911 or otherwise involve law enforcement.

60. If a joint response between law enforcement and a Mobile Crisis Response Team is initiated, to the extent possible the Mobile Crisis Response Team will stay engaged and on the scene to provide behavioral health support and intervention.

## C. Intensive In-Home Services

61. Intensive In-Home Services will be provided to Children in the Focus Population. These services are interventions built on the Child and Family's strengths and are aimed at improving the Child's functioning and the Family's ability to support the Child in the home. Consistent with Children's needs, Children will be able to access Intensive In-Home Services including Wraparound Facilitation, Individual Therapy, Family Therapy, Behavioral Support Services, Family Peer Support, Youth Peer Support, and Respite Care.

62.     The State Medicaid Program will expand capacity for Children in the Focus Population to receive additional services including transportation, psychiatric services, and medication management, as appropriate.

63.     The State Medicaid Program will seek federal authority to cover additional services for Children in the Focus Population, including Supported Employment.

64.     The State will review evidence-based practices or models that may be appropriate to use when implementing Intensive In-Home Services.  The State will indicate which models it considered and identify any it is adopting, including any plans for implementation and fidelity review, in its Implementation Plan (see Section X).

**D.     Psychiatric Services and Medication Management**

65.     The State will maintain and enforce protocols to ensure Children in the Focus Population can access psychiatric evaluations and medication management when needed.  The State will allow for telehealth provision of medication management where appropriate.

66.     Upon federal approval, the State will cover and make available mechanisms for peer-to-peer consultations between primary care providers and psychiatrists who have expertise in serving the Focus Population regarding medication management and other services where appropriate.

## VI. DIVERSION AND TRANSITION

67.     When a Child in the Focus Population with a Child and Family Team is referred for placement in a Residential Treatment Facility, the Wraparound Facilitator or Intensive Care Coordinator assigned to the Child's case will schedule a Child and Family Team meeting at the soonest opportunity that the Child, Family, and members of the Child and Family Team can meet to identify any potential changes to current or additional Home- and Community-Based Services and other supports the Child and Family need and that will prevent the residential placement.  If additional Home- and Community-Based Services could prevent the residential placement, the Wraparound Facilitator or Intensive Care Coordinator will lead efforts to secure services and supports as soon as possible.

68.      The State will establish protocols to ensure that when a Child in the Focus Population without an Intensive Care Coordinator or Child and Family Team is referred for placement in a Residential Treatment Facility, the State will connect the Child to Wraparound

Facilitation, or Intensive Care Coordination if the Child and Family prefer. A Wraparound Facilitator or Intensive Care Coordinator will be assigned in a timely manner to support the Child and Family in creating a Child and Family Team. The Wraparound Facilitator or Intensive Care Coordinator will facilitate team meetings to identify and engage immediate supports and services to assist in stabilizing the Child in the Focus Population in the home when possible. The Wraparound Facilitator or Intensive Care Coordinator will lead efforts to secure services and supports as soon as possible.

69.    The State will establish a team of individuals with knowledge of the requirements of this Agreement that can serve as support and provide technical assistance to the Child and Family Teams for the Focus Population, and that will focus on engaging Home- and Community-Based Services as an alternative to Residential Treatment Facilities when clinically appropriate.

70.    The State will provide assistance to any Child and Family Team for a Child in the Focus Population that requests support and any Child and Family Team serving a Child in the Focus Population who has experienced multiple Mobile Crisis Response and Stabilization Services or psychiatric hospitalizations over the past year.

71.    The State will conduct a regular review of each Child in the Focus Population who remains in a Residential Treatment Facility for longer than four months to identify barriers to discharge and recommend strategies to resolve barriers to the relevant Child and Family Teams.

72.    The State will revise the process for requests for authorization to Residential Treatment Facilities with the goal of ensuring Children in the Focus Population receive services in the most integrated setting appropriate to them. Determinations for appropriateness for Residential Treatment Facility placement will include consideration of the Clinical Assessment Tool, the Comprehensive Assessment, and the recommendation of the Child and Family Team. The State will review data and conduct random audits of Children in the Focus Population in Residential Treatment Facilities regularly to assess whether the process is preventing unnecessary placements, and the State will make additional revisions to the process if necessary.

73.    When a Child in the Focus Population is placed in a Residential Treatment Facility, their Wraparound Facilitator or Intensive Care Coordinator will serve as the liaison between the Child and Family Team and the Facility throughout the course of the treatment and

will work with the Facility and the Child and Family Team to plan for discharge and transition of the Child to their home and community.  The Child and Family Team or Intensive Care Coordinator will work with the Residential Treatment Facility to develop a transition Plan of Care that identifies strengths and needs of the Child, any Child-specific short- and long-term behavioral health goals, anticipated steps to achieve those goals and return the Child to the community, anticipated barriers to discharge and how they will be resolved, and a plan for securing Home- and Community-Based Services to ensure successful return to community.  The Child and Family Team or Intensive Care Coordinator will review the transition Plan of Care at least every 30 days, to identify progress toward the stated goals and any barriers to discharge. To the extent necessary to effectuate this collaboration regarding the development and review of transition Plan of Care, the State will update its policies and, if needed, use its regulatory authority to develop and recommend changes within the Nevada Administrative Code.

74.    The State will develop frequency standards for the administration of Clinical Assessment Tools for Children in the Focus Population in Residential Treatment Facilities to ensure the Clinical Assessment Tool is readministered to the Children within 90 days after admission, and thereafter every 45 days.  The State will monitor to ensure that Children in the Focus Population are transitioned back to the community as soon as possible, and generally within 30 days, if the Clinical Assessment Tool indicates that the Child's functioning can be supported in a more integrated setting. Children in the Focus Population should transition to the community when they are appropriate for community-based services, regardless of whether the score on the Clinical Assessment Tool indicates that Residential Treatment may be appropriate.

75.    The State will use its regulatory authority to develop and recommend regulation changes within the Nevada Administrative Code to ensure that discharge planning from Hospitals will include consultation with the Child in the Focus Population, their Family, and Wraparound Facilitator or Intensive Care Coordinator; and a warm handoff to Home- and Community-Based Services that the Child needs.  The State will monitor and enforce compliance with these regulations.

## VII. STAKEHOLDER OUTREACH AND PUBLIC PARTICIPATION

76.    The State will establish a multidisciplinary team within Department of Health and Human Services that will be responsible for training, engagement, and communication with

21

providers, stakeholders, and Children in the Focus Population and their Families regarding the Agreement.

77.     This team will seek and consider input from community partners, service providers, Children in the Focus Population and their Families, schools, and CMS on development, implementation, availability, and quality of Home- and Community-Based Services, including by conducting and publicizing public workshops and soliciting requests for comments on changes to rules and policies.

78.     On an ongoing basis, the State will update the relevant Commissions and Consortia regarding its implementation of this Agreement.

## VIII.   WORKFORCE AND PROVIDER DEVELOPMENT

79.     The State will work with public and private stakeholders to develop a plan to address workforce shortages for Home- and Community-Based Services for Children in the Focus Population under this Agreement.  The plan will be reviewed, analyzed, and updated to meet changes in the workforce over the course of the Agreement.  The plan will address:

   a.  A proposed methodology for a baseline and ongoing measurement of the Focus Population's Home- and Community-Based Services workforce and the adequacy of the workforce to meet the needs of Children in the Focus Population;

   b.  Identification of staffing to support and coordinate the State's Home- and Community-Based Services workforce development efforts; and

   c.  Systematic recruitment and retention strategies for providers of Home- and Community-Based Services.

80.     The State, in partnership with Clark and Washoe Counties, will develop a plan to recruit, support, and retain foster parents to serve Children in the Focus Population in the custody of child welfare agencies across the State so that they may remain in and return to Family settings. The plan will be reviewed, analyzed, and updated to meet changes in the workforce over the course of the agreement.  The plan will include:

   a.  Recruitment and retention strategies such as Child-specific recruitment, Family finding and other intensive kinship recruitment efforts, and incentives;

   b.  Identification of staffing to support and coordinate the State's foster parent recruitment and retainment efforts; and

      c.   Strategies to support and retain current foster parents to prevent unneeded placement disruptions where possible for Children in the Focus Population.

81.    The State will develop provider capacity to address the particular behavioral health needs of Children in the Focus Population who are or have been in foster care and their families. The State will offer specialized training and supports to providers who work with families who have attained permanency through adoption, guardianship, or custody.

82.    The State will make trainings available to providers of Home- and Community-Based Services to strengthen provider competency in provision of services to the Focus Population and will monitor providers of Home- and Community-Based Services to ensure staff providing these services are sufficiently trained. The State will also make trainings regarding Home- and Community-Based Services available to appropriate stakeholders, including State and county child welfare and juvenile justice workers, judges, prosecutors, public defenders, probation officers, law enforcement, and schools.

## IX. QUALITY ASSURANCE AND PERFORMANCE IMPROVEMENT

### A.    Data Collection

83.    Within six months of the Effective Date, the State will provide baseline data to the United States and the Independent Reviewer. The baseline data will include all data elements agreed upon by the parties and that the State is able to report.

84.    The State will develop collaborative agreements with county entities so that the counties share data regarding Focus Population Members in the juvenile justice system. The State will monitor compliance following establishment of these collaborative agreements.

85.    Beginning no later than six months after the State provides baseline data, the State will begin providing quarterly data to the United States and the Independent Reviewer.

86.    At a minimum, the quarterly data will leverage all data sources available to the State to include data on the following areas:

      a.   The number of Children in and the demographics of the Focus Population;

      b.   The Children in the Focus Population receiving Home- and Community-Based Services under this Agreement, broken down by County, including the types and amount of services they are receiving and the length of time of service utilization;

      c.   For Children in the Focus Population, length of time from the completion of a

Comprehensive Assessment that identifies the need for services to the initiation of Home and Community Based Services (excluding Mobile Crisis Response and Stabilization Services);

d.  Data from Mobile Crisis Response Teams, broken down by County, including the number of calls to the Crisis Hotline, the number and location of Mobile Crisis Response Team responses, timelines of responses, outcomes following responses, and the repeated use of Mobile Crisis Response Teams;

e.  Hospitalization of Children in the Focus Population, including use of emergency departments, admissions to and length of services at Hospitals for treatment of a Behavioral Health Disability, and repeated hospitalization;

f.  Placement of Children in the Focus Population in Residential Treatment Facilities,  number of Children in the Focus Population who sought authorization for Residential Treatment of Facilities, the number of Children in the Focus Population authorized for Residential Treatment Facilities, the number of Children in the Focus Population admitted to Residential Treatment Facilities and their length of stay, and the number of Children in the Focus Population remaining in Residential Treatment Facilities more than  30 days after no longer medically necessary;

g.  Involvement of Children in the Focus Population in the child welfare system, including the number of Children in the Focus Population in child welfare emergency shelter care; length of stay in the emergency shelter care; the number of Children in the Focus Population in foster care who are hospitalized for Behavioral Health Disabilities; and the number of Focus Population Members in foster care who are placed in Residential Treatment Facilities;

h.  Involvement of Children in the Focus Population in State Youth Parole Bureau facilities; and

i.  Involvement of Children in the Focus Population in the county juvenile justice systems, to the extent data are available to the State pursuant to the collaborative agreements with county entities set forth in this section.

87.  Within one year of the Effective Date, the State will develop a public-facing data dashboard on its website leveraging all data sources available to the State.  The dashboard will

include, at a minimum, the number of Children in the Focus Population placed in Residential Treatment Facilities on the last day of each month, the number of Children in the Focus Population placed in Residential Treatment Facilities out-of-state on the last day of each month, and the number of Children in the Focus Population who have been Hospitalized for a Behavioral Health Disability in the last month. The data dashboard will be updated at least quarterly but may be updated more often.

### B.    Data Analysis

88.    Within six months of the Effective Date, the State will convene a Quality Meeting that will be attended by personnel from all State agencies and entities responsible for implementing the Agreement. Quality Meetings will occur no less than quarterly to review data; analyze progress toward compliance with the Agreement; and plan, implement, and assess any needed responsive action plans to improve outcomes using a Continuous Quality Improvement framework.

89.    Within one year of the Effective Date of this Agreement, the State will develop and implement a process to regularly assess the quality of providers' provision of Home- and Community-Based Services, their adherence to the requirements identified in this Agreement, and, where appropriate, the fidelity of their provision of services to evidence-based practices or models.

90.    Within one year of the Effective Date of this Agreement, the State will conduct a systemic assessment of the Children placed in Residential Treatment Facilities, identify the services commonly needed to return to their communities, and develop a plan to address any barriers to accessing those services.

91.    No later than eighteen months after the Effective Date of this Agreement, the State will begin producing annual Quality Assurance and Performance Improvement Reports, which will include analysis of the available data, responsive action plans to address issues identified through that analysis, and information about the Quality Meetings. These Reports will measure the degree to which Children in the Focus Population are being diverted from and transitioned out of residential treatment. The Reports will also assess whether the services delivered to under this Agreement are available in a timely manner and accessible statewide to Children in the Focus Population, individualized to the Children Focus Population and their Family's strengths and needs, and sufficient in quality, intensity, and duration to meet the

Child's needs.  The Reports will identify the service needs that posed barriers to diversion or caused delays to transition and provide an estimate of the need for each service. These Reports will not contain any Child's personally identifiable information.  At six-month intervals between the annual Quality Assurance and Performance Improvement Reports, the State will produce status updates regarding any major issues identified by the Parties.

92.      The State will post Quality Assurance and Performance Improvement Reports to the State's website within 30 days of finalization.

93.      The State will ensure that its agencies and entities collaborate to collect, share, and analyze the necessary data to comply with this Agreement's requirements.

94.      Within six months of the Effective Date, the State will begin reporting to the United States and the Independent Reviewer, on a monthly basis, any neglect or abuse reports and critical incidents relating to Children in the Focus Population associated with providing Home- and Community-Based Services required by this Agreement or with Hospital or Residential Treatment Facility services provided to the Focus Population.  The State will consider these reports in planning for responsive actions to improve outcomes for Children in the Focus Population.

## C.      Quality Service Review Process

95.      "Quality Service Reviews" (QSRs) are in-depth assessments of services provided to specific Children in the Focus Population.  QSRs will evaluate if the Child and Family needs are being identified, if goals are strength based and Child and Family driven, if the Child's needs are being met in the most integrated setting appropriate to their needs, and if services provided are sufficient to enable the Child to remain with or return to their Family, home and community, if appropriate.  For Children in Hospitals and Residential Treatment Facilities, these reviews will evaluate any barriers to returning to home and community settings.

96.      Beginning eighteen months after the Effective Date and at least annually thereafter, the Independent Reviewer will conduct QSRs of a random sample of Children in the Focus Population in Hospitals, Residential Treatment Facilities, and the community.  The sample will include a sufficient number of Children receiving Home- and Community-Based Services to enable the Independent Reviewer to draw systemic conclusions about each service.  The sample will also include Children assessed using the procedures outlined in the Screening and Assessment section who are not receiving services described in the Home and Community Based

services section to enable the Independent Reviewer to draw reliable conclusions about whether the screening and assessment process is successfully identifying the Children who require the services included in this Agreement.

97.    When the Independent Reviewer and the State determine it is appropriate, the Independent Reviewer will begin training the State officials who will be responsible for the QSRs.  These State officials will shadow the Independent Reviewer while the Independent Reviewer conducts the QSRs.  Under the direction of the Independent Reviewer, the State officials will train additional State representatives to conduct the QSRs.  After the Independent Reviewer and the State agree that it is appropriate, the State representatives will conduct the QSRs using the agreed upon QSR process.  The Independent Reviewer will review and validate QSR data and analysis conducted by the State representatives.

98.    At a minimum, the QSRs will collect information through:

a.    Interviews with Children, Families, their Wraparound Facilitators/Intensive Care Coordinators, and, where appropriate, child welfare case workers, probation or parole officers, Home- and Community-Based Services providers, school staff members, and Hospital or Residential Treatment Facility staff, and

b.    Analysis of Plans of Care, Crisis Plans, transition plans, treatment records, and outcome data related to the Children whose records are reviewed.

99.    If during the course of the QSR process a Child is identified as subject to an immediate safety risk, the individual conducting the QSR will inform the State of the immediate risk and the State will take appropriate action to ensure the Child's safety.

100.    Each year, the results of the QSR will be described in writing.  The QSR analysis and description will not contain any Child's personally identifiable information.  The State and the United States will work with the Independent Reviewer to create an analysis format. Until the State representatives conduct the QSR in accordance with Paragraph 97, the Independent Reviewer will conduct the annual QSR analysis and include it in one of the Independent Reviewer's semiannual Compliance Reports. A draft of QSR analysis and description will be provided to the State and the United States for comment at least 30 days prior to its finalization. The State and the United States will provide comments and/or corrections, if any, to the Independent Reviewer within 15 days of receipt of the draft. The Independent Reviewer will consider the responses of the State and the United States and make appropriate changes, if any,

before finalizing the QSR summary for inclusion in the Compliance Report.  The Independent Reviewer will provide a response to the State and the United States explaining his or her reasons for not incorporating any comments or requests.

101.    When State representatives take responsibility for conducting the QSR, the State representatives will complete the analysis using the same approach as the Independent Reviewer. The State will publish its annual QSR analysis in its annual report, along with a summary written by the Independent Reviewer of his or her review of the State's QSR, including a report of the review and validation determination made by the Independent Reviewer. A draft of the summary will be provided to the State and the United States for comment at least 30 days prior to its issuance.  The State and the United States will provide comments and/or corrections, if any, to the Independent Reviewer within 15 days of receipt of the draft summary. The Independent Reviewer will consider the responses of the State and the United States and make appropriate changes, if any, before issuing the final summary for inclusion in the QSR report.  The Independent Reviewer will provide a response to the State and the United States explaining his or her reasons for not incorporating any comments or requests into the final summary.

102.    The State will use data from the QSRs to identify strengths and areas for improvement at the provider, region, and system-wide levels. The State will identify responsive steps to improve services in response to the analysis of quality sampling review data in its Quality Assurance and Performance Improvement Reports.

## X.  IMPLEMENTATION

103.    Within five years, the State will develop and ensure the substantial availability of the services required under this Agreement and reduce its dependence on Hospitals and Residential Treatment Facilities for the Focus Population in accordance with Title II of the ADA. The State will develop a specific Implementation Plan to fulfill the obligations of this Agreement.

104.    Within 30 days of the Effective Date, the State will designate an Agreement Coordinator to coordinate compliance with this Agreement and to serve as a point of contact for the Parties and the Independent Reviewer.

105.    The State will develop its first annual Implementation Plan and provide it to the United States and Independent Reviewer within six months of the Effective Date.  The

Implementation Plan will be designed to bring the State into compliance with the ADA and all requirements of this Agreement within five years.  At a minimum, the Implementation Plan will include timelines and steps it will take to:

    a.  Ensure statewide access for the Focus Population to Home and Community-Based Services described in this Agreement;

    b.  Create and implement a plan to address workforce shortages and provider development relating to services in this Agreement;

    c.  Develop a data collection and reporting plan;

    d.  Develop quality assurance and performance improvement measures; and

    e.  Achieve reduction of Children in the Focus Population being unnecessarily placed in Hospitals and Residential Treatment Facilities, including setting goals and benchmarks for the total reduction of Focus Population members in these settings in accordance with Title II of the ADA.

106.    The United States and the Independent Reviewer will provide comments regarding the Implementation Plan within 30 days of receipt. The State will consider all comments and, if necessary, timely revise its Implementation Plan to address comments from the United States and the Independent Reviewer; the Parties and the Independent Reviewer will meet and consult as necessary.  After the State has revised the Implementation Plan, it will invite and consider public comment and feedback, including from the stakeholders described in Section VII.

107.    The Parties and the Independent Reviewer will meet and consult at least monthly during the first year of this Agreement and at least quarterly thereafter.

108.    Annually, the State will supplement the initial Implementation Plan to update and provide additional detail regarding remaining implementation activities.  The United States and the Independent Reviewer will provide comments regarding the Implementation Plan supplements within 30 days of receipt. The State will consider all comments and, if necessary, timely revise its Implementation Plan and supplements. The State will also address any areas of non-compliance or other recommendations identified by the Independent Reviewer in its supplemental Implementation Plans.

109.     The State will make the Implementation Plan publicly available, including by posting the initial Implementation Plan, and each supplemental Implementation Plan, on the State's website.

110.     To implement the requirements of this Agreement, the State will seek all necessary funding and authority to establish a Specialty Managed Care Plan that will be responsible for service delivery management and data system development for the Focus Population in Medicaid.  In addition, the State may establish a stakeholder advisory committee to advise the State with its development of the new Specialty Managed Care Plan, including contract requirements.

111.     The State will submit any proposed policy or regulatory changes needed to effectuate this Agreement, including changes to its Medicaid program, to the United States and the Independent Reviewer before implementation.  The United States and the Independent Reviewer will respond to the State with any comments within 30 days of receiving the proposed changes.

## XI.  INDEPENDENT REVIEWER

112.     There will be an Independent Reviewer.  The role of the Independent Reviewer will be to assess and report on compliance with the provisions of the Agreement and to make recommendations to the State to support the State in attaining substantial compliance.  The State will retain the Independent Reviewer.

113.     This Agreement requires that Tim Marshall, as contractor with the Innovations Institute of the University of Connecticut School of Social Work (Innovations Institute), and with the support of Innovations Institute staff, personnel, and contractors, will be the Independent Reviewer.

114.     Pursuant to the Nevada State Purchasing Act and applicable regulations, the State will request a solicitation waiver if necessary, or will begin other steps to effectuate an alternative contractual tool, within 10 days of the Effective Date. If approved, the State will execute a contract with the Innovations Institute, for the use of Tim Marshall's services as the Independent Reviewer as soon as practicable under normal Nevada purchasing and contracting processes.

115.   If the solicitation waiver is required but not approved, the parties will meet and confer regarding the designation of an Independent Reviewer.

116.   The initial contract with the Innovations Institute for the Independent Reviewer's services will be for a period of three years, subject to an evaluation by the Parties to determine whether to renew the contract.  Subject to an agreement by both Parties, the contract may be extended in increments of appropriate duration as agreed upon by the Parties. Any renewal must be made pursuant to the Nevada State Purchasing Act and any applicable State regulations.  At the end of any Independent Reviewer contract, the Parties may agree to either modify the role of the Independent Reviewer or agree that an Independent Reviewer is no longer necessary.  If the Parties fail to agree, the Parties will meet and confer regarding the role and/or necessity of an Independent Reviewer.  If, after meeting to confer and discuss, the Parties do not agree, the State may file a motion with the Court seeking relief.

117.   The Independent Reviewer will only be removed for good cause or breach of the Innovations Institute's contract.   The State agrees to request adequate funds from the Legislature to pay the cost of the contract.  In the event the Independent Reviewer resigns, or the Innovations Institute's contract is terminated or expires without renewal, within 60 days thereof, the State and United States will meet and confer with the intent to agree upon a replacement along with a request for a solicitation waiver.  In the event of a lapse in appropriations, the State cannot disburse funds or enter a new contract until funds are appropriated.

118.   The Parties recognize the importance of ensuring that the fees and costs of monitoring the Agreement are reasonable.  The Innovations Institute will submit a proposed annual budget for the Independent Reviewer's services. The United States will have the opportunity to comment on the submitted budget proposal.  The Parties foresee that the budget for the first year will be under $225,000.  The Parties will retain the discretion, subject to Nevada law, to amend the contract pursuant to Nevada law and regulations to increase the Independent Reviewer's budget by a specific amount at the Independent Reviewer's request where the Parties agree it is necessary for the Independent Reviewer to fulfill his or her duties under the Agreement and is not due to a failure in planning, budgeting, or performance by the Independent Reviewer.

119.   The Independent Reviewer will only have the duties, responsibilities, and authority conferred by this Agreement.

120.    The Independent Reviewer will conduct compliance reviews. The purpose of the compliance reviews is to determine compliance with the provisions of this Agreement. Compliance reviews will be conducted in part through the Quality Service Review and will be informed by the State's data and additional data and information gathered by the Independent Reviewer.

121.    Neither the State, the United States, nor any of their staff or agents will have any supervisory authority over the Independent Reviewer's activities, reports, findings, or recommendations.

122.    Only the Independent Reviewer will have authority to review or disclose internal monitoring records. Internal monitoring records include any documentation of internal deliberations among the Independent Reviewer and its consultants, and any drafts of reports or other work product produced during the Independent Reviewer's duties.

123.    The Independent Reviewer may contract or consult with other persons or entities to assist in the evaluation of compliance. The Independent Reviewer will pay for these services out of his or her budget. The Independent Reviewer is ultimately responsible for any compliance assessments made under this Agreement.

124.    The Independent Reviewer will be permitted to engage in ex parte communications with the State, and the United States, regarding this Agreement.

125.    The Independent Reviewer and the United States (and its agents) will have full access to persons, staff, facilities, buildings, programs, services, documents, data, records, materials, and things that are necessary to assess the State's progress and implementation efforts with this Agreement. The United States and/or the Independent Reviewer will provide reasonable notice of any visit or inspection or request for access to any State facilities. Advance notice will not be required if the Independent Reviewer or the United States has a reasonable belief that a Child faces a risk of immediate and serious harm. Access is not intended, and will not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with information disclosed to the Independent Reviewer or the United States under this paragraph.

126.    The Independent Reviewer, Innovations Institute staff, personnel and contractors supporting the Independent Reviewer, and the United States will sign a confidentiality and/or a

nondisclosure agreement to ensure that all confidential information, privacy rights, and privileges are protected including, but not limited to, all personal health information.

127.    In completing his or her responsibilities, the Independent Reviewer may request written reports and data from the State concerning compliance.  The State will have a reasonable amount of time to compile any reports or data that it provides pursuant to the request.

### A.    Review Plan

128.    Within 90 days of the date the Independent Reviewer's contract is fully executed under the requirements of Nevada state law, the Independent Reviewer will develop a draft review plan and provide it to the Parties for comment.

129.    The State and the United States will have 30 days to offer comments or requests on the review plan.

130.    The Independent Reviewer will consider all comments and finalize the initial review plan. The Independent Reviewer will provide a response to the State or the United States as appropriate explaining his or her reasons for not incorporating any comments or requests into the final review plan.

131.    As necessary, the Independent Reviewer may amend and revise the review plan throughout the period of this Agreement.  The Independent Reviewer will offer the Parties an opportunity to comment on any proposed revisions and will consider all comments before finalizing.

### B.    Compliance Reports

132.    The Independent Reviewer will conduct a baseline review to become familiar with Nevada's children's behavioral health service system.  The Independent Reviewer will work with the State and the United States and review baseline data in conducting the baseline review.

133.    Within three months of receiving baseline data, the Independent Reviewer will provide his or her preliminary observations and recommendations in a baseline Compliance Report (which will follow the same draft and comment process as in Section XI.A).

134.    The Independent Reviewer will conduct a compliance review and issue a Compliance Report   nine months after the baseline Compliance Report. The Independent Reviewer will conduct its next compliance review and issue its next Compliance Report one year

later, and then every six months thereafter.  A draft Report will be provided to the State and the United States in draft form for comment at least 30 days prior to its issuance.  The State and the United States will provide comments and/or corrections, if any, to the Independent Reviewer within 15 days of receipt of the draft Report. The Independent Reviewer will consider the responses of the State and the United States and make appropriate changes, if any, before issuing the final Report.  The Independent Reviewer will provide a response to the State or the United States as appropriate explaining his or her reasons for not incorporating any comments or requests into the final report.

135.    The Compliance Reports will describe the steps taken by the State to implement this Agreement and will evaluate the extent to which the State has complied with the substantive provisions of the Agreement.  Each Compliance Report:

    a.  Will evaluate the status of compliance for the relevant provisions of the Agreement using the following standards: (1) Substantial Compliance; (2) Partial Compliance; and (3) Non-compliance.

    b.  Will describe the steps taken to assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the Independent Reviewer's findings; and

    c.  May provide recommendations to support the State in achieving compliance with each provision.

136.    The State will post the Compliance Reports on their website within 30 days after they are finalized. No personally identifiable information will be included in the Compliance Reports.

137.    The Independent Reviewer has an obligation to provide accurate information in Compliance Reports and other representations.  If the Independent Reviewer becomes aware of any misrepresentations that were included in a Compliance Report, the Independent Reviewer will provide the Parties with a correction or addendum as needed.

### C.    Independent Reviewer's Relationship with Others

138.    In completing the Independent Reviewer's responsibilities, the Independent Reviewer may testify in enforcement proceedings regarding any matter relating to the

implementation, enforcement, or dissolution of the Agreement, including, but not limited to, the Independent Reviewer's observations, findings, and recommendations in this matter.

139.    The Independent Reviewer, and any staff or consultants retained by the Independent Reviewer, will not:

    a.  Be liable for any claim, lawsuit, or demand arising out of their activities under this Agreement (this paragraph does not apply to any proceeding for payment under contracts into which they have entered in connection with their work under the Agreement);

    b.  Be subject to formal discovery in any litigation involving the services or provisions reviewed in this Agreement, including deposition(s), request(s) for documents, and request(s) for admissions, interrogatories, or other disclosure;

    c.  Testify in any other litigation or proceeding with regard to any act or omission of the State or any of the State's agents, representatives, or employees related to this Agreement, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Agreement, nor serve as a non-testifying expert regarding any facts that he or she may have learned as a result of his or her performance under this Agreement.

140.    The State and the United States will not otherwise employ, retain, or be affiliated with the Independent Reviewer, or professionals retained by the Independent Reviewer while this Agreement is in effect, unless the other Party gives its written consent to waive this prohibition.

141.    If the Independent Reviewer resigns from their position as Independent Reviewer, or their contract is terminated or not renewed, the former Independent Reviewer may not enter any contract with the State or the United States on a matter encompassed by this Agreement without the written consent of the other Party while this Agreement remains in effect.

## XII. ENFORCEMENT, COLLABORATIVE APPROACH TO DISPUTE RESOLUTION, AND TERMINATION

142.    The State agrees that all of its appropriate agencies will take all actions necessary to comply with provisions of this Agreement and will collaborate to coordinate care as indicated.

143.    The Nevada Legislature has the authority under the Nevada Constitution and laws to appropriate funds for, and amend laws pertaining to, the State's system of services for people with mental illness. If the State fails to obtain necessary appropriations to comply with this Agreement, the United States has the right to withdraw its consent to this Agreement and revive any claims otherwise barred by operation of this Agreement. The United States agrees that it will not allege material breach of any provision based solely on the amount of appropriations, unless the United States can show it was not made in good faith.

144.    The Parties agree to file this Agreement jointly with the United States District Court for the District of Nevada, contemporaneously with a Complaint and a joint motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 41(a)(2).  The joint motion to dismiss will request that the Court retain jurisdiction to enforce the Agreement for the limited purpose of resolving motions filed by the United States pursuant to Paragraphs 146-148 or motions filed by the State pursuant to Paragraphs 116, 149-152, and 154.   The case will remain on the Court's inactive docket, subject to restoration to the active docket upon a motion made by either Party for these limited purposes. In the event the Court declines to retain this limited jurisdiction or declines to enter the Parties' proposed order outlining these specific terms, this Agreement will become null and void and the United States has the right to revive any claims otherwise barred by operation of this Agreement.

145.    The Parties intend to pursue a collaborative approach to achieve the purpose of this Agreement and to resolve disputes that may arise in the implementation of this Agreement regarding language, meaning, requirements, or construction of this Agreement.  This problem-solving approach is so that disagreements can be minimized and resolved amicably, and the energies of the Parties can be focused on the State's compliance with the provisions of this Agreement and the ADA.  If a dispute arises between the Parties, the Parties agree to attempt first to resolve the dispute through discussion between the Parties. The Parties agree that filing a motion to restore the case to the Court's active docket pursuant to the terms of this Agreement will be a last resort. If the Parties reach a resolution that varies from the Agreement, the resolution will be reduced to writing as an Agreement modification, signed by both Parties, and filed with the Court along with a joint motion to modify the dismissal order and enter the modified Agreement.

146.    If the United States determines that the State has materially breached any provision of the Agreement, the United States will, prior to moving to restore the case to the active docket for the purpose of resolving a motion to enforce, give the State and the Independent Reviewer written notice of the alleged material breach, specifying the basis for that determination. The Parties will engage in good-faith discussions to resolve any dispute arising from a notice of alleged material breach.  The State will have up to 90 days from the date of such notice to cure the alleged material breach (or such additional time as reasonable due to the nature of the issue and agreed upon by the Parties) and provide the United States with sufficient proof of its cure, or to reach agreement with the United States on a plan for curative action.

147.    At the end of the up to 90 day period, or such additional time as agreed upon by the Parties, and if the United States determines that the alleged material breach has not been cured and if the Parties have not reached an agreed plan for curative action, the United States may notify the State of its intent to file a motion to restore the case to the active docket for the limited purpose of determining whether a material breach of any  provision has occurred and ordering any appropriate  remedy.

148.    If the United States notifies the State of its intent to file such a motion, the United States will seek mediation with the State to resolve the dispute without enforcement proceedings. The Parties will split the cost of the mediation. If the mediation does not result in a resolution, the United States may file its motion.  The United States will carry the burden to prove any material breach it alleges by motion.

149.    This Agreement will terminate on October 1, 2029, if the State has attained substantial compliance with all provisions and maintained that compliance for a period of one year.  If there is a dispute at that time, the State may file a motion to restore the case to the active docket pursuant to this Agreement. If the Court finds that the State has attained substantial compliance and maintained that compliance for one year, the Court may terminate the Agreement, in its entirety. The State will carry the burden to prove its attainment and maintenance of substantial compliance with this Agreement.

150.    Non-compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure by the State to maintain substantial compliance.

151.    The State may seek termination of any full substantive Section or Subsection; any requirements related to any service or other distinct area of implementation; or any sufficiently severable provision of this Agreement at any time if it has attained substantial compliance with all provisions in that Section or Subsection; requirements related to that service or distinct area; or a provision that is sufficiently severable and maintained substantial compliance for one year. If the Parties agree that the State has done so, they may execute an amendment to the Agreement terminating any such Section or Subsection; requirements; or provision.  The Parties will file the amendment with the Court along with a joint motion to modify the dismissal order and enter the modified Agreement.  If the Parties do not agree, the State may file a motion to restore the case to the active docket pursuant to this Agreement. If the Court finds that the State substantially complied with the provisions in that Section or Subsection; requirements related to the service or distinct area; or a provision that is sufficiently severable, and maintained substantial compliance for at least one year, the Court may enter an order that the State has substantially complied and enter the appropriate modification striking the full substantive Section or Subsection; relevant requirement; or provision  from the Agreement. A provision is sufficiently severable when it contains a distinct obligation that does not rely upon the implementation of other provision(s). The State will carry the burden to prove its attainment and maintenance of substantial compliance for each Section or Subsection; requirement; or provision. The State will carry the burden to prove severability of any individual provision(s) asserted to be in substantial compliance.

152.    Regardless of this Agreement's specific requirements, the Agreement will terminate if the State proves to the Court that it has come into substantial compliance with the ADA and maintained that substantial compliance for a period of one year. The State may file a motion to restore the case to an active docket for the purpose of seeking a Court order terminating the Agreement upon substantial compliance with the ADA.  The State will carry the burden to prove its substantial compliance with the ADA.

153.    Should any provision of this Agreement be declared or determined by any court to be illegal, invalid, or unenforceable, the validity of the remaining parts, terms, or provisions will not be affected.  The Parties will not, individually or in combination with another, seek to have any court declare or determine that any provision of this Agreement is invalid.

154.    While the State is committed to providing the services required by this Agreement, the Parties acknowledge the State's representation that in order to sustain such performance, its related budgets have necessarily been structured to be dependent on current federal funding obligations related to Medicaid health care coverage for Children. If the State determines that complying with any requirement of this Agreement would be an obstacle to meeting the goals of this Agreement, or if changed financial (including to the Federal Medicaid program) or other factual conditions make compliance with the Agreement substantially more onerous, or if the Agreement proves to be unworkable because of unforeseen obstacles, the Parties will meet and confer to discuss whether modifications may be needed, and if so, to draft modifications. If the State provides the United States with written explanation specifying how financial or other factual changes and/or unforeseen obstacles have made particular provisions substantially more onerous or unworkable, the United States will not refuse proposed modification(s) without first providing responsive written explanation specifying the United States' disagreement (regarding the scope of changed circumstances, workability/onerousness, and/or propriety of proposed modifications as applicable).    If, after meeting to confer and discuss, and after exchange of written specified explanations of the Parties' positions regarding modification, the Parties do not agree, the State may file a motion with the Court seeking relief.

155.    Nothing in this agreement will preclude the State from seeking authority from CMS for approval of coverage of Medicaid services under a different name than that used in this Agreement. If the terms and definitions in this Agreement create a barrier to using necessary funding, including but not limited to Medicaid funds, or violate any state or federal statute, rule or regulation, the Parties agree to meet and confer to support maximizing available funds for implementation of the Agreement.

156.    This Agreement will constitute the entire integrated agreement of the Parties. Any modification of this Agreement will be executed in writing by the Parties, signed by both Parties, and filed with the Court along with a joint motion to modify the dismissal order and enter the modified Agreement.

## XIII.   GENERAL PROVISIONS

157.    The Agreement is binding on all successors, assignees, employees, agents, contractors, and all others working for or on behalf of the State to implement the terms of this Agreement.

158.    This Agreement is enforceable only by the Parties.  No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action.  Accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement.  Nothing in this Agreement shall be construed as conferring a private right of action for enforcement or damages against the State.

159.    Interpretation of this Agreement shall be governed by the following rule of construction: "including" means including without limitation, unless otherwise specified.

160.    The United States and the State shall each bear the cost of their own fees and expenses incurred in connection with this case.

161.    The Parties agree that, as of the Effective Date of this Agreement, litigation is not "reasonably foreseeable" concerning the matters described in this Agreement.  To the extent that any Party previously implemented a litigation hold to preserve documents, electronically stored information, or things related to the matters described in this Agreement, the Party is no longer required to maintain such a litigation hold.  Nothing in this paragraph relieves any Party of any other obligations imposed by this Agreement, including the document creation and retention requirements described herein.

162.    The State will not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the United States' investigation or the Independent Reviewer's activities related to this Agreement.  The State will timely and thoroughly investigate any allegations of retaliation in violation of this Agreement and take any necessary corrective actions identified through such investigations.

163.    Failure by any Party to enforce this entire agreement or any provision thereof with respect to any deadline or any other provision herein will not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Agreement.

164.    The Parties will promptly notify each other of any court or administrative challenge to this Agreement or any portion thereof, and will defend against any challenge to the Agreement.

165.    The Parties represent and acknowledge this Agreement is the result of extensive, thorough, and good faith negotiations. The Parties further represent and acknowledge that the terms of this Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of the allegations set forth in the Department of Justice's letter of findings under the ADA dated October 4, 2022. Each Party to this Agreement represents and warrants that the person who has signed this Agreement on behalf of a Party is duly authorized to enter into this agreement and to bind that Party to the terms and conditions of this Agreement.

166.    Nothing in this Agreement shall be construed as an acknowledgement, an admission, or evidence of liability of the State under the Constitution of the United States or federal or state law, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

167.    Nothing in this Agreement "shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA." See 28 C.F.R. § 35.130(e)(1).

168.    This Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each party is not a signatory to the original or the same counterpart.

169.    The performance of this Agreement will begin immediately upon the Effective Date.

170.    The State will maintain sufficient records and data to document that the requirements of this Agreement are being properly implemented and shall make such records available to the Independent Reviewer and the United States for inspection and copying on a reasonable basis.  Such action is not intended, and shall not be construed, as a waiver, in litigation with third parties, of any applicable statutory or common law privilege associated with such information.  Other than to carry out the express functions as set forth herein, both the United States and the Independent Reviewer will hold such information in strict confidence to the greatest extent possible.

171.    "Notice" under this Agreement will be provided by email to the signatories below or their successors.

FOR THE UNITED STATES:

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REGAN RUSH
Chief, Special Litigation Section

_/s/ Deena Fox_____
DEENA FOX
Deputy Chief, Special Litigation Section

_/s/ Haley Van Erem_____
HALEY VAN EREM
Trial Attorney, Special Litigation Section

_/s/ Beth Kurtz_____
BETH KURTZ
Trial Attorney, Special Litigation Section

Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. – 4CON
Washington, DC 20530
(202) 598-5016
haley.vanerem@usdoj.gov

Dated:  January 2, 2025

FOR NEVADA:

_____

RICHARD WHITLEY
Director
Department of Health and Human Services
State of Nevada


Dated: January 2, 2025